*476 APPEL, Justice.
In this case, we consider the validity of a warrantless search of a probationer’s home by police officers. The defendant was charged with burglary and theft. The defendant filed a motion to suppress, challenging the admissibility of evidence obtained from the search. The defendant contended the search warrant was invalid because it inaccurately described the house to be searched and because an alteration of the warrant based upon a telephonic conversation with the issuing judge was invalid. The district court overruled the motion to suppress. For the reasons expressed below, we reverse the district court and remand the case for further proceedings.
I. Factual Background and Proceedings.
On May 18, 2011, a Plymouth County deputy sheriff responded to a report of a burglary of a home. The deputy met with the resident who reported a number of missing items, including two televisions, two jewelry boxes with assorted jewelry, a gift card to Minerva’s Restaurant, and a camera. The deputy’s investigation revealed that a doorjamb had been broken when the door was apparently forced open. There was a partial shoe print on the outside of the door and partial fingerprints on the door. Tire impressions were found going from the concrete driveway into the grass along the side of the house.
Law enforcement contacted Minerva’s Restaurant and advised that a $100 gift card had been stolen. Based on their inquiries, sheriff deputies obtained a receipt from the restaurant that was generated from the gift card’s use. Justin Short’s signature appeared on the receipt. Deputies also interviewed the waitress and the manager, who identified a photo of Short as the person who used the card.
Deputies received an informant’s tip that the car of Short’s girlfriend, Leya Lorenzen, was parked at 272Í Jones Street in Sioux City. Law enforcement obtained a search warrant for that address from a district associate judge in Le Mars. The application identified the place to be searched as a “single story wood frame home white and yellow in color” with a “single stall garage.” Local police assisting in the search, however, later reported that Lorenzen did not reside at the location identified on the warrant. After law enforcement inquired at the address identified on the warrant, the resident who answered explained that he did not know Lorenzen or Short but stated that there was an apartment next door and “people are coming and going from there all the time.” The new location was a two-story house that had been converted into four apartments. Deputies then contacted the owner of the apartment building and learned that Lorenzen had rented an apartment at 2723 ½ Jones Street, which was the upstairs apartment.
At this point, law enforcement called the judge who issued the original search warrant and asked if they should return to Le Mars to get another search warrant. According to the testimony of the law enforcement officer at the hearing on the motion to suppress, the district associate judge gave law enforcement verbal authorization to change the address on the warrant and “to note that this was done tele-phonically through the authority of’ the issuing judge. Law enforcement scratched out the address on the original warrant and wrote in the new address. Law enforcement also scratched through the word “yellow” describing the house, however they left the description of the place to be searched as “a single story wood frame home.” No statement was added to the original warrant indicating *477 that it had been altered pursuant to verbal authorization of the court.
Law enforcement then conducted a search of the apartment at 2723 ½ Jones Street. Upon executing the search, police found two flat screen televisions, two jewelry boxes taken in the burglary, the stolen Minerva’s Restaurant gift card, and a receipt in Short’s wallet. After receiving Miranda warnings, Short admitted that he kicked in the door of the residence, took the missing items, and pawned some of the items at a local pawn shop. Short was subsequently charged with burglary and theft.
During the investigation, law enforcement learned that Short was on probation related to other crimes. Although probation officials were contacted in connection with the burglary investigation, they did not participate in the search. It is undisputed that the search was not a probationary search, but was instead an investigatory search by law enforcement related to new crimes.
Short sought to suppress all evidence obtained as a result of the search. In his brief to the trial court, Short claimed he had a constitutionally protected expectation of privacy in the apartment; his probation agreement did not give officers unfettered access to search; the altered search warrant violated Iowa Code section 808.3 (2011), which requires that search warrant applications be in writing; and the statements and evidence gathered during the search should be suppressed as fruit of an illegal search. The State raised a number of issues in its resistance, including claiming that the search warrant was valid even after altered, that exigent circumstances were present to support the search, and that the waiver in Short’s probation agreement authorized law enforcement personnel to search the apartment without a warrant. In its brief, however, the State solely argued that the search was lawful based on reasonable suspicion that Short was involved in the crime.
The district court entered a detailed ruling. It found that the application for the original warrant was not tainted, but that the description of the place to be searched in the original warrant was inadequate. In so ruling, the district court noted that the warrant described a single story house with a garage stall and not a two story house divided into apartment units with a parking lot in back rather than garage stalls. The description in the altered warrant cured some of the problems, according to the district court, but it held that the telephonic authorization to alter the warrant was contrary to Iowa Code section 808.3. The district court further found that no exigent circumstances existed to support an exception to the warrant requirement. On the issue of whether a warrantless search of a probationer could be upheld in this case, however, the district court held in favor of the State. The district court reasoned that the officers had reasonable suspicion to believe that stolen property would be located at the residence, but that in order to be valid, the search must have been within the contemplation of the probation agreement. As a result of the ruling, the evidence obtained during the search was admitted into evidence and Short was convicted.
Short appealed. We transferred the matter to the court of appeals. The court of appeals held that the claim under article I, section 8 of the Iowa Constitution was adequately preserved in the district court. On the merits the court found that the search of a probationer based upon reasonable suspicion of criminal activity and based upon the limited scope of the search was valid under article I, section 8 of the Iowa Constitution.
*478 We granted further review. We now vacate the decision of the court of appeals, reverse the decision of the district court on the motion to suppress, and remand the case to the district court.
II. Standard of Review.
Claims that the district court failed to suppress evidence obtained in violation of the Federal and Iowa Constitutions are reviewed de novo. State v. Dewitt, 811 N.W.2d 460, 467 (Iowa 2012). The same is true of claims of ineffective assistance of counsel. State v. Straw, 709 N.W.2d 128, 133 (Iowa 2006).
III. Discussion.
A. Positions of the Parties.
1. Short. Short challenges the denial of the motion to suppress on appeal. Short first asserts that he had a constitutionally protected interest in the apartment, the district court correctly determined that the original search warrant lacked specificity, the district court correctly determined that the alteration to the warrant pursuant to telephonic authorization was invalid, and there were no exigent circumstances to support a warrantless search.
After addressing these issues, Short focuses on the fighting issue in this case, namely, whether the warrantless search of a probationer’s home by law enforcement officers violates article I, section 8 of the Iowa Constitution. Short claims that in State v. Ochoa we emphasized the property rights underpinning the sanctity of the home and highlighted that our cases underscore the high importance of a warrant issued by a neutral and detached magistrate when a home search was involved. 792 N.W.2d 260, 284-85 (Iowa 2010). Short recognizes that the Ochoa court did not address “whether individualized suspicion amounting to less than probable cause may be sufficient in some contexts to support a focused search,” id. at 291, but argues that the reasoning in Ochoa suggests that a warrant requirement for a home invasion by law enforcement is required, see id. at 287-91.
Short further relies on State v. Cullison, 173 N.W.2d 533 (Iowa 1970). In that case, we invalidated a warrantless search of the home of a parolee. Id. at 540-41. According to Short, the holding in Cullison, namely, that the search and seizure rights of a parolee are not reduced due to his or her status, id. at 538-39, “remained untouched” by Ochoa and applies with equal force to probationers. Short also notes that the search in this case was not a probationary search, but was instead a search by general law enforcement officers, a fact that further undermines the validity of the search.
Short maintains that the state constitutional issue was adequately preserved in the district court. In any event, Short argues that if the issue was not preserved under the Iowa Constitution, his counsel was ineffective for not raising the issue. See Taylor v. State, 352 N.W.2d 683, 684-85 (Iowa 1984) (describing review of claims of ineffective assistance of counsel).
2. The State. The State contends that Short did not preserve his argument below under the Iowa Constitution. It argues that Short did not argue that the Iowa Constitution should be interpreted differently from the Fourth Amendment before the district court, and suggests that the district court’s citation of Ochoa should not be construed to mean that the Iowa Constitution was duly raised.
The State’s sole argument on the merits of the appeal is that because the search of a probationer was supported by reasonable suspicion, the search was constitutionally valid. In support of its argument, the State cites Griffin v. Wisconsin, 483 U.S. *479 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), and United States v. Knights, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). In both cases, the United States Supreme Court upheld warrantless searches of the homes of probationers based upon reasonable suspicion under the Fourth Amendment. In Griffin, the Supreme Court upheld a warrantless search of a probationer by probation officers that was based upon reasonable suspicion and was performed in compliance with a Wisconsin regulation authorizing such searches. 483 U.S. at 870-71, 880, 107 S.Ct. at 3167, 3172, 97 L.Ed.2d at 715-16, 722. In Knights, Griffin was extended to include searches conducted by general law enforcement officers. Knights, 534 U.S. at 120-22, 122 S.Ct. at 592-93, 151 L.Ed.2d at 506-07. Relying upon Knights and Griffin, the State argues that Short’s claim under article I, section 8 of the Iowa Constitution lacks merit.
The State recognizes that in Ochoa, we departed from the interpretations of the United States Supreme Court. See 792 N.W.2d at 287-91. Yet, the State argues that Ochoa did not hold that warrantless searches were invalid, but only that war-rantless searches of parolees without at least some individualized suspicion were invalid. See id. at 291. The State narrowly interprets Ochoa as indicating acquiescence in warrantless searches of parolees and probationers based upon individualized suspicion.
IV. Issue Preservation.
We first begin our discussion of issue preservation with a review of what issues were not presented by the State in this appeal. The State did not advance an argument that the warrant originally obtained was not defective, that the alteration of the warrant did not violate the requirement of Iowa Code section 808.3, or that exigent circumstances existed to justify a warrantless search. We need not consider the extent to which these arguments may have had merit, as under our rules and our precedents they have been waived in this appeal. See Iowa R.App. P. 6.903(2)(g )(3) (requiring appellant to present arguments and supportive authority in appeal brief and stating “[fjailure to cite authority in support of an issue may be deemed waiver of that issue”); State v. Seering, 701 N.W.2d 655, 661 (Iowa 2005) (“In the absence of an argument on these allegations [on appeal], we deem them waived.”); Hyler v. Garner, 548 N.W.2d 864, 870 (Iowa 1996) (confining consideration to issues raised on appeal); Richardson v. Neppl, 182 N.W.2d 384, 390 (Iowa 1970) (“A proposition neither assigned nor argued presents no question and need not be considered by us on review”).
Further, although the district court cited Short’s argument that his probation agreement did not give law enforcement officers unfettered access to conduct a search, the district court specifically only found that “the police had the right to search Short’s residence under the terms of his probation” and therefore, “the search was not unlawful.” The district court made no finding or holding regarding whether the probation agreement itself constituted valid consent. Cf. Knights, 534 U.S. at 118-20 & n. 6, 122 S.Ct. at 591-92 & n. 6, 151 L.Ed.2d at 504-05 & n. 6 (“We need not decide whether Knights’ acceptance of the search condition constituted consent in the ... sense of a complete waiver of his Fourth Amendment rights ... because we conclude that the search of Knights was reasonable under our general Fourth Amendment approach of ‘examining the totality of the circumstances’.... ” (Internal quotation marks omitted.)). On appeal, the State did not argue that Short voluntarily consented to the search. The *480 word “consent” does not appear in the State’s brief,[1] nor did the State cite cases where the issue of consent validated a warrantless search. As a result, the issue of whether the conditions of probation amounted to a voluntary consent is not before us.[2] See Ochoa, 792 N.W.2d at 292 (finding the State’s failure to argue on appeal that appellant consented to a search at the door would ordinarily waive the issue); cf. Parkhurst v. White, 254 Iowa 477, 481, 118 N.W.2d 47, 49 (1962) (“Appellees do not argue the question ... and we consider it waived.”). As noted in Feld v. Borkowski, 790 N.W.2d 72, 78 n. 4 (Iowa 2010),
in the absence of the most cogent circumstances, we do not create issues or unnecessarily overturn existing law sua sponte when the parties have not advocated for such a change.... [W]e are restrained to apply the controlling law as advocated by the parties....
(Citation omitted.) It is important that our waiver rules be consistently applied in all cases and that we not apply special rules for certain parties without a principled basis for doing so.[3]
We now turn to issue preservation questions related to Short’s claims. The State suggests that the constitutionality of the search under article I, section 8 of the Iowa Constitution was not presented to the district court. In his motion to suppress, however, Short specifically cited article I, section 8 of the Iowa Constitution as the basis for his argument that the search was invalid because there was no effective warrant. Further, the district court appears to have recognized the state constitutional argument in its opinion when it extensively discussed Ochoa, a case solely involving article I, section 8 of the Iowa Constitu *481 tion, see 792 N.W.2d at 284-86. It is clear that Short was claiming to the district court that a warrant was required for the search under the Iowa Constitution. We therefore agree with the court of appeals that the issue presented on appeal was adequately preserved. See Lamasters v. State, 821 N.W.2d 856, 864 (Iowa 2012) (“If the court’s ruling indicates that the court considered the issue and necessarily ruled on it, even if the court’s reasoning is incomplete or sparse, the issue has been preserved.” (Internal quotation marks omitted.)); State v. Paredes, 775 N.W.2d 554, 561 (Iowa 2009) (“[W]here a question is obvious and ruled upon by the district court, the issue is adequately preserved.”).
Y. Warrantless Searches of the Homes of Probationers by Law Enforcement Officers.
A. Introduction. The larger question of whether law enforcement officers may search a probationer’s home without a valid warrant under the facts of this case depends upon resolution of two subsidiary questions. The first question is whether a warrantless search of a probationer’s home is permissible when, as here, reasonable suspicion of criminal activity is present. If the answer to this question is yes, a second question emerges — namely, whether law enforcement officers, as distinguished from probation officers, may conduct the search.
In considering these issues under article I, section 8 of the Iowa Constitution, we reach our decisions independently of federal constitutional analysis. We may, of course, consider the persuasiveness of federal precedent, but we are by no means bound by it. See Ochoa, 792 N.W.2d at 267 (“The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision.”); see also State v. Pals, 805 N.W.2d 767, 771 (Iowa 2011). We may look to the caselaw of other states, to dissenting opinions of state and federal courts, and to secondary materials for their persuasive power. See State v. Baldon, 829 N.W.2d 785, 792-800 (Iowa 2013) (considering secondary sources and court decisions from other states); Ochoa, 792 N.W.2d at 276-87 (discussing state caselaw, federal dissenting opinions, and academic commentary).
B. Established Principles of Independent State Constitutional Law.
1. Introduction. Neither party has questioned or sought to limit our responsibility to independently construe the Iowa Constitution. Neither party, for example, has suggested on appeal that this court’s approach to independent state law as outlined in Ochoa, Pals, or Baldon is incorrect or should be modified. Our approach to reviewing independent state constitutional claims was thoroughly explored in Baldon, Pals, and Ochoa. See Baldon, 829 N.W.2d at 803-35 (Appel, J., concurring specially); Pals, 805 N.W.2d at 771-72; Ochoa, 792 N.W.2d at 264-67, 287-91. For the purpose of clarity and emphasis, we review the principles of our independent state constitutional jurisprudence reflected in these cases.
2. States’ constitutions as the original protectors of individual rights; the Federal Constitution as the follower of state tradition. At the outset, we note that state constitutions and not the Federal Constitution were the original sources of written constitutional rights. See Baldon, 829 N.W.2d at 803-09 (Appel, J., concurring specially). For example, eight state constitutions had provisions related to search and seizure prior to the adoption of the Federal Constitution. Bernard Schwartz, The Great Rights of Mankind: *482 A History of the American Bill of Rights 88 (expanded ed.1992). John Adams, who attended oral argument by James Otis in Paxton’s Case, was the drafter of article XIV of the Massachusetts Constitution of 1780, one of the important state constitutional precursors of the Fourth Amendment. See Baldón, 829 N.W.2d at 805-06.
At the federal constitutional convention, whenever the issue of individual rights arose, the founders repeatedly expressed the view that they looked to the states for the preservation of individual rights. James Wilson declared that the purpose of the states was “ ‘to preserve the rights of individuals.’ ” Baldon, 829 N.W.2d at 808 (quoting 1 Records of the Federal Convention of 1787, at 356 (Max Farrand ed., 1937)). Oliver Ellsworth, who would later become Chief Justice of the United States Supreme Court, declared at the constitutional convention that “ ‘he turned his eyes’ ” to state governments “ ‘for the preservation of his rights.’ ” Paul Finkel-man & Stephen E. Gottlieb, Introduction: State Constitutions and American Liberties, in Toward a Usable Past: Liberty Under State Constitutions 1, 4 (Paul Fink-elman & Stephen E. Gottlieb eds., 1991). James Madison, in The Federalist No. 15, declared that “ ‘[t]he powers reserved to the several States will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people....’” Baldón, 829 N.W.2d at 808 (quoting The Federalist No. 15, at 363 (James Madison) (John C. Hamilton 1868)).
Given the primary role of the states in developing individual rights, it is not surprising that, “prior to the adoption of the federal Constitution, each of the rights eventually recognized in the federal Bill of Rights had previously been protected in one or more state constitutions.” William J. Brennan Jr., State Constitutions and the Protection of Individual Rights, 90 Harv. L.Rev. 489, 501 (1977). As noted by a leading scholar in the area, there is now an emerging consensus that the Federal Bill of Rights originated in state and colonial rights guarantees. See Robert F. Williams, The State Constitutions of the Founding Decade: Pennsylvania’s Radical 1776 Constitution and Its Influences on American Constitutionalism, 62 Temp. L.Rev. 541, 541 (1989) (“Constitutional scholars have long recognized that many of the features of the United States Constitution were modeled on the earlier state constitutions.”). The provisions of the Bill of Rights, including the Fourth Amendment, were modeled by state constitutional provisions and not vice versa as is commonly assumed. See Steven G. Calabresi et al., State Bills of Rights in 1787 and 1791: What Individual Rights Are Really Deeply Rooted in American History and Tradition.?, 85 S. Cal. L.Rev. 1451, 1452-53 (2012) (noting that rights in the Federal Bill of Rights emerge from state and colonial bills of rights).
3. Strong emphasis on individual rights under the Iowa Constitution. The bill of rights in the Iowa Constitution was not considered by Iowa constitutional writers as some kind of appendage controlled by federal court interpretations. Unlike the Federal Constitution, the bill of rights was part of the first articles of the Iowa Constitutions of 1846 and 1857.[4] According to George Ells, Chair of the Committee on the Preamble and Bill of Rights, “the Bill of Rights is of more importance than all the other clauses in the Constitution put together, because it is the foundation and written security upon which the people rest their rights.” 1 The Debates of the Constitutional Convention of the State of *483 Iowa 103 (W. Blair Lord rep., 1857) [hereinafter The Debates], available at www. statelibraryofiowa.org/services/collections/ law-library/iaconst. Article I, section 1, borrowed from the Virginia Declaration of Rights, speaks of “inalienable rights” that are presumably beyond the reach of majo-ritarian government. See Iowa Const, art. I, § 1; Virginia Declaration of Rights (1776), available at http://www.archives. gov/exhibits/charters/virginia_declaration_ of rights.html. Article I, section 8 of the Iowa Constitution of 1857 mirrors the language of the Fourth Amendment except for a semicolon that was placed between the reasonableness clause and the warrant clause in the Iowa Constitution. Compare U.S. Const, amend. IV, with Iowa Const, art. I, § 8. This semicolon suggests the framers believed that there was a relationship between the reasonableness clause and the warrant clause, much as was the case with the original search and seizure provision of the Massachusetts Constitution of 1780. See Ochoa, 792 N.W.2d at 268-69 & n. 7.
Indeed, there is powerful evidence that the Iowa constitutional generation did not believe that Iowa law should simply mirror federal court interpretations. While the due process clause of article I, section 9 of the Iowa Constitution was similar to the Due Process Clause of the United States Constitution, Ells noted that the clause was “violated again and again by the dominant party in the land, which rides roughshod ove[r] the necks of freemen.” The Debates at 102. Further, Ells noted that
[i]f the words ‘due process of law,’ shall in time be recognized by our judicial tribunals to mean what they really do mean ... [t]hen, sir, that infamous Fugitive Slave Law will become a nu[l]lity, and the American people will trample its odious enactments in the dust.
Id. Of course, during this time period the United States Supreme Court upheld the Fugitive Slave Law from constitutional attack. See, e.g., Ableman v. Booth, 62 U.S. (21 How.) 506, 526, 16 L.Ed. 169, 177 (1858) (“[T]he act of Congress commonly called the fugitive slave law is, in all of its provisions, fully authorized by the Constitution of the United States_”).
As has often been celebrated, the first decision of the Supreme Court of the Territory of Iowa, In re Ralph, rejected the claim that a slave present in a free state should be returned to his master, noting that under Iowa law a slave within the free territory of Iowa is not “property” and that the laws regarding illegal restraint apply “to men of all colors and conditions.” 1 Morris 1, 7 (Iowa 1839). Counsel for Ralph urged that as a result of the organic law (specifically referring to the territorial constitutions of Wisconsin and Iowa), Ralph was a free man. Id. at 2. Specifically, counsel asserted that under the organic law of Iowa and Wisconsin, “‘[n]o man shall be deprived of his liberty, or property, but by the judgment of his peers, or the law of the land.’”[5] Id. (quoting the Northwest Ordinance of 1787, art. 2, in 32 Journals of the Continental Congress 1771-1789, at 340 (Roscoe R. Hill, ed.1936) [hereinafter Journals ]). He further ar *484 gued that under the organic law, “There shall be neither slavery nor involuntary servitude in the said territory....” Id. (quoting the Northwest Ordinance of 1787, art. 6, in Journals at 343).
The Iowa court held for Ralph. Id. at 7. In closing, however, the court emphasized that when a person “illegally restrains a human being of his liberty, it is proper that the laws, which should extend equal protection to men of all colors and conditions, should exert their remedial interposition.” Id. The decision in In re Ralph flatly contradicted the infamous Dred Scott decision of the United States Supreme Court in 1857. See Dred Scott v. Sanford, 60 U.S. (19 How.) 393, 451, 15 L.Ed. 644, 691 (1856) (“[T]he right of property in a slave is distinctly and expressly affirmed in the Constitution.”), superseded by constitutional amendment, U.S. Const. amend. XIV; In re Ralph, 1 Morris at 7.
“While Dred Scott was decided after the Iowa Constitutional Convention of 1857 adjourned, the first state legislature convened under the new Iowa Constitution expressed its view on the Dred Scott decision and its reasoning. The Iowa legislature declared in a resolution that “the case of Dred Scott, is not binding in law or conscience upon the government or people of the United States,” and that
we should be ungrateful to those whose care and foresight provided for us free homes, and derelict in our duty to those who still come after us, did we not promptly and sternly denounce this new doctrine, which if established, degrades the free states.
1858 Iowa Acts Res. 12, at 433. We have not found a record of the debate on the resolution, but there is little doubt that an argument that Iowa courts should defer to Dred Scott in the interpretation of the Iowa Constitution as presumptively valid would not have received a favorable reception.
The independent authority of state courts to construe state constitutional provisions free from federal precedent was early recognized in McClure v. Owen, 26 Iowa 243, 254-55 (1868). In McClure, we stated:
The same principles that require the federal courts to follow the decisions of the State courts in construing statutes, and to recognize rules of local law, require the federal courts to follow the construction given the [state] Constitution by the highest state tribunal.
Id. at 255. As is often celebrated, our subsequent cases dealing with the rights of African Americans adopted an approach much different than the United States Supreme Court ultimately adopted in Plessy v. Ferguson, 163 U.S. 537, 540-52, 16 S.Ct. 1138, 1139-44, 41 L.Ed. 256, 257-61 (1896) (upholding state law requiring separate but equal accommodations for white and nonwhite railway passengers as constitutional against challenges under the Thirteenth and Fourteenth Amendments), overruled by Brown v. Board of Education, 347 U.S. 483, 494, 74 S.Ct. 686, 692, 98 L.Ed. 873, 880-81 (1954) (rejecting the separate but equal doctrine in the context of public education). See Coger v. Nw. Union Packet Co., 37 Iowa 145, 154-57 (1873) (citing article I, section 1 of the Iowa Constitution in rejecting the notion that African Americans could be subjected to different treatment in public transportation); Clark v. Bd. of Dirs., 24 Iowa 266, 276-77 (1868) (rejecting the argument that a school district could forbid African American children from attending school on the ground of race). In State v. Tonn, we emphasized that we were free to depart from federal constitutional analysis in considering the search and seizure provision of the Iowa Constitution. See 195 Iowa 94, *485 104-07, 191 N.W. 530, 535-36 (1923) (recognizing the decided weight of state authority against the rule of a federal case and determining we would forge a different path), abrogated on other grounds by Mapp v. Ohio, 367 U.S. 643, 654-55, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1089-90 (1961).
4. The diminution in substance of federal rights resulting from incorporation triggers renewal of independent state constitutional law. Beginning with Gitlow v. New York, the United States Supreme Court began to incorporate against the states various provisions of the Bill of Rights under the Due Process Clause of the Fourteenth Amendment. 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138, 1145 (1925) (“[W]e may and do assume that freedom of speech and of the press— which are protected by the First Amendment from abridgment by Congress — are among the fundamental rights ... protected by the Due Process Clause of the Fourteenth Amendment from impairment by the states.”). The incorporation of the Bill of Rights, however, created a tendency for the United States Supreme Court to dilute the substance of the rights themselves. See Baldón, 829 N.W.2d at 813 (“In the period following the incorporation revolution ending "with Mapp, there is no doubt the strength and scope of the Fourth Amendment’s protection has been dramatically reduced by the United States Supreme Court.”). Any review of the relationship between state and federal constitutional interpretation that fails to understand or ignores this fundamental and powerful legal riptide is flawed.
In a series of opinions, Justice Harlan presciently predicted that one of the unintended consequences of the extension of federal constitutional rights to the states would be their dilution. Williams v. Florida, 399 U.S. 117, 136, 90 S.Ct. 1914, 1925, 26 L.Ed.2d 446, 474 (1970) (Harlan, J., dissenting) (recognizing the decision to allow a six person jury “simply reflects the lowest common denominator in the scope and function of the right to trial by jury”); Duncan v. Louisiana, 391 U.S. 145, 182 n. 21, 88 S.Ct. 1444, 1466 n. 21, 20 L.Ed.2d 491, 514 n. 21 (1968) (Harlan, J., dissenting) (noting “a major danger of the ‘incorporation’ approach — that provisions of the Bill of Rights may be watered down in the needless pursuit of uniformity”); Ker v. California, 374 U.S. 23, 45, 83 S.Ct. 1623, 1646, 10 L.Ed.2d 726, 745 (1963) (Harlan, J., concurring in judgment) (pondering whether the United States Supreme Court “[was] prepared to relax Fourth Amendment standards in order to avoid unduly fettering the States”).
We have seen the federalism discount predicted by Justice Harlan operate with full force in the search and seizure context. Since incorporation, the relatively clear requirements of the Warrant Clause have been overridden by vague notions of reasonableness, the role of consent has changed from its narrow beginnings to a more protean formulation, and the exclusionary rule has been substantially eroded
by a good faith exception. See California v. Acevedo, 500 U.S. 565, 582-83, 111 S.Ct. 1982, 1992-93, 114 L.Ed.2d 619, 636 (1991) (Scalia, J., concurring in judgment) (recognizing development of nearly two dozen exceptions to the warrant requirement); United States v. Leon, 468 U.S. 897, 923-24, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677, 699 (1984) (announcing the “good faith exception” to the exclusionary rule); Schneckloth v. Bustamante, 412 U.S. 218, 234-46, 93 S.Ct. 2041, 2056-58, 36 L.Ed.2d 854, 872-74 (1973) (departing from the narrow consent doctrine established in Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938)). See generally Baldón, 829 N.W.2d at 812-14 (“Nothing in the Su *486 preme Court’s incorporation doctrine as it related to the Fourth Amendment altered the independent nature of state constitutional provisions related to search and seizure .... Incorporation of the provisions of the Bill of Rights of the United States Constitution against the states through the Due Process Clause of the Fourteenth Amendment established a federal floor related to civil liberties.”); George C. Thomas III, When Constitutional Worlds Collide: Resurrecting the Framers’ Bill of Rights and Criminal Procedure, 100 Mich. L.Rev. 145, 150-51 (2001) (observing that after incorporation of the Bill of Rights, “the dilution of [the Bill of Rights] flowed backward[s]” and that “the process of incorporation took a sledgehammer to the federal criminal procedure guarantees”). According to Professor Williams, decisions of the United States Supreme Court declining to recognize rights “must always be viewed as partially attributable to ‘under-enforcement’ ” as a result of federalism and other institutional concerns that explicitly or implicitly pervade Supreme Court decisions. Robert F. Williams, The Law of American State Constitutions 137 (2009) [hereinafter Williams]; cf State v. Hunt, 91 N.J. 338, 450 A.2d 952, 962 (1982) (Pashman, J., concurring) (noting hesitancy of the United States Supreme Court “to impose on a national level far-reaching constitutional rules binding on each and every state”).
As a result of the United States Supreme Court’s retreat in the search and seizure area, there has been a sizeable growth in independent state constitutional law. A survey of jurisdictions in 2007 found that a majority of the state supreme courts have departed from United States Supreme Court precedents in the search and seizure area to some degree. See generally Michael J. Gorman, Survey: State Search and Seizure Analogs, 77 Miss. L. J. 417 (2007). There are now hundreds of independent state constitutional search and seizure cases, and the number grows over time. Because of the tendency of the United States Supreme Court to underenforce or dilute search and seizure principles, it can be argued that these precedents are “entitled to less weight than other state decisions interpreting similar state constitutional law provisions.” Williams at 137; cf. State v. Black, 815 S.W.2d 166, 193 (Tenn.1991) (Reid, C.J., concurring in part and dissenting in part) (“Tennessee constitutional standards are not destined to walk in lock step with uncertain and fluctuating federal standards and do not relegate Tennessee citizens to the lowest levels of constitutional protection, those guaranteed by the national constitution.”).
The growth of independent state constitutional law, however, has not been universally celebrated. As Professor Williams has bemoaned, adoption of independent state constitutional law has occasionally provoked what Williams has called a “bitter, accusatorial” dissent. Williams at 180 (citing People v. Scott, 79 N.Y.2d 474, 583 N.Y.S.2d 920, 593 N.E.2d 1328, 1348-49 (1992) (Bellacosa, J., dissenting)). Yet, as was noted twenty years ago in connection with independent state constitutional law, “heightened rhetoric adds nothing to the jurisprudence of our State.” State v. Canelo, 139 N.H. 376, 653 A.2d 1097, 1106 (1995) (Johnson, J., concurring specially). And, according to a leading authority on state constitutions, writing in 1998, the concern about the legitimacy of relying on state constitutional guarantees “has largely been put to rest.” G. Alan Tarr, Understanding State Constitutions 169 (1998).
5. The aggressive, maximalist character of lockstep approach as “precommitment device” preventing independent examination of facts and law. One question is whether state courts should engage in *487 independent state constitutional analysis when the language of their state constitutional provisions are similar or identical to their federal counterparts. There is ample precedent for the notion that the mere similarity of language does not prevent state courts from engaging in independent analysis. See, e.g., State v. Gerschoffer, 763 N.E.2d 960, 965 (Ind.2002) (“The Indiana Constitution has unique vitality, even where its words parallel federal language.”); People v. Barber, 289 N.Y. 378, 46 N.E.2d 329, 331 (1943) (recognizing the court was bound to exercise independent judgment under the state constitution); State v. Arrington, 311 N.C. 633, 319 S.E.2d 254, 260 (1984) (noting the court was not bound by the United States Supreme Court’s construction of identical constitutional provisions); Commonwealth v. Edmunds, 526 Pa. 374, 586 A.2d 887, 894-95 (1991) (stating the court was free to reject United States Supreme Court conclusions if it remained faithful to the Federal Constitution’s minimum guarantees).
The notion that parallel language in the Iowa Constitution is not tied to United States Supreme Court interpretations in the search and seizure area was powerfully endorsed by Judge Sutton of the United States Court of Appeals for the Sixth Circuit, who wrote in a published article:
There is no reason to think, as an interpretive matter, that constitutional guarantees of independent sovereigns, even guarantees with the same or similar words, must be construed the same. Still less is there reason to think that a highly generalized guarantee, such as prohibition on “unreasonable” searches, would have just one meaning for a range of differently situated sovereigns.
Jeffrey S. Sutton, What Does — and Does Not—Ail State Constitutional Law, 59 U. Kan. L.Rev. 687, 707 (2011). Judge Sutton further asks why we should live in a “top-down constitutional world,” when allowing states to decide whether to embrace or accept innovative legal claims can inform the United States Supreme Court when considering whether to federalize the rule. Id. at 712-13 (internal quotation marks omitted).
Indeed, according to Professor Williams, lockstepping state law to federal precedents is not a humble or minimalist approach, but is an aggressive and maximalist approach to the law. See Williams at 224-29 (discussing several problems to the lockstepping approach). It amounts to what Professor Adrian Vermeule refers to as a “precommitment device” that prevents a state supreme court from considering each case based on an independent examination of facts and law. See Adrian Vermeule, The Judicial Power in the State (and Federal) Courts, 2000 Sup.Ct. Rev. 357, 366 (2000).
6. The double irony in the appeal to uniformity. The independent state law cases also address the question of the value of uniformity. First, it is doubtful that uniformity is a constitutional value in a federal system. Indeed, diversity of constitutional analysis is baked into the constitutional cake where states retain sovereign authority over questions not delegated to the federal government by the United States Constitution. As noted by Professor Williams, reliance on decisions of the United States Supreme Court to interpret state constitutional provisions is “misplaced” and an “unwarranted delegation of state power to the Supreme Court.” Robert F. Williams, In the Supreme Court’s Shadow: Legitimacy of State Rejection of Supreme Court Reasoning and Result, 35 S.C. L.Rev. 353, 403-04 (1984). In an era when societies advocate renewal of federalism by returning power to the state, it is ironic that an exception is made for state judicial power.
*488 There is a second irony. Although the claim is sometimes made that adoption of the United States Supreme Court’s approach in the search and seizure area will promote uniformity or ease of administration, the opposite is in fact true. Consider this. The jurisprudence of the United States Supreme Court in the search and seizure area has been characterized by scholars as “not merely complex and contradictory, but often perverse.” Akhil Reed Amar, Fourth Amendment First Principles, 107 Harv. L.Rev. 757, 758 (1994).[6] These descriptions have resulted, in part, because the United States Supreme Court has applied at least five different analytical models to search and seizure cases, based upon the warrant requirement, individualized suspicion, case-by-case analysis, a balancing test, and an approach relying on common law plus balancing. See Thomas K. Clancy, The Fourth Amendment: Its History and Interpretation 470-511 (2008). Even members of the Supreme Court have characterized its Fourth Amendment jurisprudence as “an inconsistent jurisprudence that has been with us for years.” Acevedo, 500 U.S. at 583, 111 S.Ct. at 1993, 114 L.Ed.2d at 636 (Scalia, J., concurring in judgment).
If these authorities are only half right, incorporation of the body of federal law under the Iowa Constitution will incorporate confusion, not certainty. Cf. State v. Caraher, 293 Or. 741, 653 P.2d 942, 946 (1982) (“Eight years of uniformity with U.S. Supreme Court decisions has not, however, brought simplification to the law of search and seizure in this state.”); Planned Parenthood of Middle Tenn. v. Sundquist, 38 S.W.3d 1, 14-15 (Tenn.2000) (noting Tennessee constitutional standards not designed to walk in lockstep with “uncertain and fluctuating federal standards”); State v. Jackson, 937 P.2d 545, 550 (Utah Ct.App.1997) (noting two Utah Supreme Court departures from United States Supreme Court search and seizure precedent, done for purpose of establishing more workable rule for police and trial courts). See generally 1 Jennifer Friesen, State Constitutional Law: Litigating Individual Rights, Claims, and Defenses § l:03[4][b], at 1-16 (4th ed.2006) [hereinafter Friesen] (“Independent holdings in *489 the states can, and do, bring stability and simplicity to constitutional law in the face of frequent, baffling inconsistencies and changes in Supreme Court doctrines.”). Indeed, a stronger, clearer warrant requirement, such as advocated by Short in this case, will create greater, not less, uniformity and certainty.
7. The burdens on law enforcement and lawyers. The lack of uniformity does not create a substantial burden on professional law enforcement who now receive professional training and are assisted by well-educated county attorneys in their law enforcement functions. Further, law enforcement officers need to be acquainted only with one standard, namely, whatever standard is most restrictive. See 1 Fries-en § 1.03[4][b], at 1-15. There is simply no reason to believe that Iowa law enforcement is less capable than its counterparts in states such as New York, New Jersey, Washington, or Oregon, where independent state constitutional law has been embraced by the state courts. See Baldón, 829 N.W.2d at 814-15.
It could be asserted that independent state constitutional law creates a burden for lawyers. For instance, teaching opinions written decades ago suggesting that lawyers might commit malpractice by failing to pursue state constitutional theories may provoke criticism. See, e.g., State v. Lowry, 295 Or. 337, 667 P.2d 996, 1013 (1983) (Jones, J., concurring specially) (“Oregon ... lawyers ... should recognize that under the majority’s philosophy and the most recent reflections by the United States Supreme Court ... they should not rely upon the substantial changes in federal constitutional cases recently decided by the United States Supreme Court.... Any defense lawyer who fails to raise an Oregon Constitution violation and relies solely on parallel provisions under the federal constitution, except to exert federal limitations, should be guilty of legal malpractice.”), disapproved on other grounds by State v. Owens, 302 Or. 196, 729 P.2d 524, 531 (1986). Yet, over two decades ago, an experienced Iowa appellate lawyer, writing in the pages of the Drake Law Review, declared that “ignorance should be no excuse in the third century of American law” for the failure of lawyers to develop state constitutional arguments different from federal precedents, noting that between 1971 and 1986 there were over three hundred cases where state courts departed from federal precedents in the interpretation of state constitutional law. See Bruce Kempkes, The Natural Rights Clause of the Iowa Constitution: When the Law Sits Too Tight, 42 Drake L.Rev. 593, 656-57 (1993). The number of independent state constitutional cases has grown exponentially since then. In 2010, the Conference of Chief Justices passed a resolution urging law schools to teach state constitutional law, noting, among other things, that state constitutional guarantees of rights “ ‘are often greater than federally guaranteed individual rights and liberties’ ” and that “ ‘being a competent and effective lawyer requires an understanding of both the Federal Constitution and state constitutional law.’ ” Robert F. Williams, Why State Constitutions Matter, 45 New Eng. L.Rev. 901, 912 (2011) (citation omitted).
The work required to be a “competent and effective” lawyer as envisioned by the Conference of Chief Justices is not overwhelming. As noted by Jennifer Friesen in her important treatise on state constitutional law, lawyers may find cases rejecting federal precedents by simply checking relevant citations. See 2 Friesen § 11.01 n. 5, at 11-4. In addition to readily searchable caselaw, there is now a very large volume of readily accessible secondary materials discussing just about every aspect of state constitutional law. A diligent lawyer thus has ready access to the *490 materials necessary to develop state constitutional law arguments.
8. “Criteria” as a solution in search of a problem. The independent state constitutional cases also address the issue of whether there should be some kind of “criteria” before a state court engages in independent legal analysis. As Professor Williams has pointed out, “[t]he often unstated premise that U.S. Supreme court interpretations of the federal Bill of Rights are presumptively correct for interpreting analogous state provisions is simply wrong.” Williams at 135. Williams notes that John Paul Stevens referred to the “misplaced sense of duty” which occurs when a state court believes the boundaries of its state constitution are marked by the Supreme Court in its interpretation of the Federal Constitution. See id. at 170 (citing Delaware v. Van Arsdall, 475 U.S. 673, 699, 106 S.Ct. 1431, 1445, 89 L.Ed.2d 674, 696 (1986) (Stevens, J., dissenting)). As noted by Utah Chief Justice Christine Durham:
Independent analysis must begin with the constitutional text and rely on whatever assistance legitimate sources may provide in the interpretive process. There is no presumption that federal construction of similar language is correct.
State v. Tiedemann, 162 P.3d 1106, 1114 (Utah 2007); see State v. Kennedy, 295 Or. 260, 666 P.2d 1316, 1322 (1983) (noting “the non sequitur that the United States Supreme Court’s decisions under [the Federal Bill of Rights] not only deserve respect but presumptively fix its correct meaning also in state constitutions”).
While it has been observed that “[c]itation to a federal opinion ... too often serves as a substitute for the considered reasoning that should accompany a particular interpretation of a state’s constitution,” Lawrence Friedman & Charles H. Baron, Baker v. State and the Promise of the New Judicial Federalism, 43 B.C. L.Rev. 125, 127 (2001), our independent authority to construe the Iowa Constitution does not mean that we generally refuse to follow the United States Supreme Court decisions. For example, in State v. Breuer, we rejected the approach of another state court that required the physical presence of a warrant at the location of a judicially authorized search or seizure. 808 N.W.2d 195, 199-201 (Iowa 2012). We determined that the approach of the United States Supreme Court provided the most persuasive reasoning. See id. at 197-201. Certainly adoption of appropriate federal precedents that “illuminate open textured provisions” of a state constitution is not a compromise of the court’s obligation to independently construe the provision. See State v. Lamme, 216 Conn. 172, 579 A.2d 484, 490 (1990). We should feel free to adopt the approach of persuasive federal precedent but should “never feel compelled to parrot” federal interpretations. Davenport v. Garcia, 834 S.W.2d 4, 20 (Tex.1992). What is required under the Iowa Constitution, in each and every case that comes before us, is not mere identification of a potentially analogous federal precedent, but exercise of our best, independent judgment of the proper parameters of state constitutional commands.
In addition to arising from a substantively flawed premise, criteria approaches further have the potential to complicate and distort the nature of judicial decisions by encouraging elaborate discussion on the nature of the arcane criteria itself rather than the broad values underlying the constitutional provision. Cf. Williams at 162, 167-68. As a result, one of the states that first developed a criteria approach, Washington, has now emphasized that the criteria are only “nonexclusive.” Sofie v. Fi-breboard Corp., 112 Wash.2d 636, 771 P.2d *491 711, 725 (1989) (citing State v. Wethered, 110 Wash.2d 466, 755 P.2d 797, 800 (1988)).
9. Limitations of advocacy and preservation. Notwithstanding the development of independent state constitutional law, in many cases lawyers do not advocate an Iowa constitutional standard different from the generally accepted federal standard. As a matter of prudence, we have adopted the approach in these cases that we will utilize the general standard urged by the parties, but reserve the right to apply the standard in a fashion different than the federal caselaw. See Baldon, 829 N.W.2d at 822-28. As a majority of this court noted in State v. Edouard, such an approach is sound practice. See State v. Edouard, — N.W.2d -, 2014 WL 3537034 (Iowa 2014). There can often be considerable difference among judges and courts in the application of open textured constitutional principles such as “reasonableness,” “rational basis,” “reasonable expectation of privacy,” “totality of circumstances,” and many others.[7] Where no party questions the general framework applicable in a case, we may disagree with federal courts in the application of that principle. See State v. Bruegger, 773 N.W.2d 862, 883 (Iowa 2009). As noted by Judge Judith Kaye of the New York Court of Appeals, when the court disagrees with the application of precedents, “our considered judgment hardly justifies attack for lack of principle.” People v. Scott, 79 N.Y.2d 474, 583 N.Y.S.2d 920, 593 N.E.2d 1328, 1347 (1992) (Kaye, J., concurring). The only way to avoid the possibility of differences in judgment over the application of open textured general principles to the facts at hand where there are a number of plausible alternatives is to have a one-person court whose declarations are binding in all cases. Further, we have emphasized that we may apply open textual standards more stringently than the federal caselaw under the Iowa Constitution. See Bruegger, 773 N.W.2d at 883; Racing Ass’n of Cent. Iowa v. Fitzgerald, 675 N.W.2d 1, 5 (Iowa 2004). See generally Fair Cadillac-Oldsmobile Isuzu P’ship v. Bailey, 229 Conn. 312, 640 A.2d 101, 104 (1994) (“[I]t is clear that our adoption, for purposes of state constitutional analysis, of an analytical framework used under the federal constitution does not preclude us from concluding that a statute that would be valid under the federal constitution is nevertheless invalid under our state constitution.”); Edouard, — N.W.2d at - (Appel, J., concurring specially); Malan v. Lewis, 693 P.2d 661, 670 (Utah 1984) (although state and federal equal protection provisions incorporate the same general framework, our construction and application of the Utah equal protection provision is not controlled by federal courts); Robert F. Williams, Equality Guarantees in State Constitutional Law, 63 Tex.L.Rev. 1195, 1219 (1985) (noting methodology of state courts applying federal constructs independently but reaching results that conflict with federal courts).
In some cases, we have vindicated claims based on search and seizure violations under the United States Constitution and not the Iowa Constitution. See State v. Kooima, 833 N.W.2d 202, 206 (Iowa 2013); State v. Tyler, 830 N.W.2d 288, 292 (Iowa 2013). In these cases, we found it unnecessary to address whether there were any violations under the Iowa Constitution. Kooima, 833 N.W.2d at 206; Ty *492 ler, 830 N.W.2d at 292. In Kooima, we expressly stated that “even where a party has not advanced a different standard for interpreting a state constitutional provision, we may apply the standard more stringently than federal caselaw.” 833 N.W.2d at 206. A similar statement was presented in Tyler. 830 N.W.2d at 291-92. We do not think the resolution of these cases under federal law should be construed as qualifying or overruling what Tyler characterized as what “we have consistently stated,” namely, that we “ ‘jealously protect this court’s authority to follow an independent approach’ ” to claims made under the Iowa Constitution and that we reserve the right even in cases where parties do not advocate a different standard to apply the standard differently than federal precedents. Id. at 291 (quoting Pals, 805 N.W.2d at 771). To the extent there are any lingering notions to the contrary, we explicitly reject them today.
10. Reaffirmation and application of precedents to Iowa constitutional issue presented in this case. Our recent cases of Cline, Ochoa, Pals, Baldón, and the special concurrence in Edouard outline our approach to independent state constitutional law under article I, section 8 of the Iowa Constitution as summarized above. Today, we again reaffirm these principles. To the extent our cases can be read as having implications contrary to the above approach, they are specifically overruled.
Turning now to the question before us, the Iowa constitutional precedent under article I, section 8 on the question of whether a warrant is required before law enforcement may search a person’s home based on the person’s status is Cullison. See 173 N.W.2d at 535. In Cullison, we held that a parolee did not suffer a diminution of constitutional protections from war-rantless search and seizures simply because of his status as a parolee. See id. at 538-39. Although Cullison involved a parolee rather than a probationer, see id. at 534, the analytic structure of Cullison applies with equal force to both. The fundamental question before the court today is whether the holding and analysis in Culli-son under the Iowa Constitution continue to be good law or whether we should abandon it in favor of the innovations resulting from the United States Supreme Court’s reconstruction of search and seizure doctrine in recent years.
C. Pre-Cullison Caselaw. Prior to our decision in Cullison, the caselaw regarding whether a warrant was required before searching the home of a probationer or parolee was inconclusive. Some cases from other jurisdictions held that a probationer or parolee had lesser constitutional rights than citizens generally. See U.S. ex rel. Randazzo v. Follette, 282 F.Supp. 10, 13 (S.D.N.Y.1968) (finding parole to be a powerful factor in determining the validity of the search); People v. Hernandez, 229 Cal.App.2d 143, 40 Cal.Rptr. 100, 104 (1964) (determining the reasonableness or probable cause requirement did not apply when parole supervisors searched parolees). On the other hand, there was contrary authority. See, e.g., Brown v. Kearney, 355 F.2d 199, 200 (5th Cir.1966) (finding a parolee is entitled to constitutional protection from illegal search and seizure); People v. Overall, 7 MichApp. 153, 151 N.W.2d 225, 226-27 (1967) (invalidating warrantless search of parolee). For example, in United States v. Lewis, a federal district court held that a search of a parolee’s apartment without a warrant was invalid, absent consent of the parolee. 274 F.Supp. 184, 187 (S.D.N.Y. 1967).
At about the time of Cullison, however, there were two prominent features of search and seizure law in both the federal *493 and state courts. First, the United States Supreme Court, and this court, expressed strong preference for validly, obtained warrants. The existing caselaw was summarized in Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971), where the court noted:
[T]he most basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval of a judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well delineated exceptions. The exceptions are jealously and narrowly drawn, and there must be a showing by those who seek exemption ... that the exigencies of the situation made that course imperative.
Id. (footnotes omitted) (internal quotation marks omitted).
Second, the cases emphasized the importance of the sanctity of the home in search and seizure jurisprudence. For instance, in United States v. United States District Court, the Supreme Court summarized the state of the law by noting that “physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.” 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752, 764 (1972). Similarly, we long ago emphasized that in connection with constitutional liberties, there is “no higher or stronger guaranty than that of his home, his papers, and [personal] effects.” State v. Sheridan, 121 Iowa 164, 167, 96 N.W. 730, 731 (1903). We have declared that the asserted right of officers to “thrust themselves into a home” is a matter of “grave concern.” State v. Brant, 260 Iowa 758, 763, 150 N.W.2d 621, 625 (1967).
In Agnello v. United States, the two concepts of the warrant requirement and the importance of the home merged. 269 U.S. 20, 33, 46 S.Ct. 4, 6-7, 70 L.Ed. 145, 149 (1925). The Agnello Court emphasized that
[b]elief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause.
Id. at 33, 46 S.Ct. at 6, 70 L.Ed. at 149; accord Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948) (emphasizing the role of a warrant in search and seizures involving the home).
In addition, many years ago, we stated that the protections in search and seizure law were to be given “a broad and liberal interpretation for the purpose of preserving ... liberty.” State v. Height, 117 Iowa 650, 661, 91 N.W. 935, 938 (1902). A broad and liberal interpretation to search and seizure was reflected in Sheridan, where this court was one of the first courts in the nation to embrace the exclusionary rule in connection with search and seizure violations. See 121 Iowa at 165-69, 96 N.W. at 731-32; see also State v. Cline, 617 N.W.2d 277, 285 (Iowa 2000) (“An example of this court’s attempts to preserve the spirit of Iowa’s constitutional guarantee is reflected in the fact that Iowa was one of the first states to embrace the exclusionary rule as an integral part of its state constitution’s protection against unreasonable searches and seizures, and, in fact, did so several years before the United States Supreme Court’s decision in Weeks [v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) ]. The genesis of Iowa’s exclusionary rule was a civil case, Reifsnyder v. Lee, 44 Iowa 101 (1876).”), abrogated in part on other grounds by State v. Turner, 630 N.W.2d 601, 606 n. 2 (2001).
D. Overview of State v. Cullison. We have not specifically confronted the *494 question of whether a probationer may be subjected to a warrantless home search, but we have considered whether a parolee may be subject to a warrantless search. In Cullison, a parolee was subject to a warrantless search of his living quarters by a parole supervisor. See 173 N.W.2d at 534-35. On appeal, the petitioner argued the search violated article I, section 8 of the Iowa Constitution. See Defendant’s brief and argument at 20, Cullison, 173 N.W.2d 533 (Iowa 1970) (No. 53491) [hereinafter Defendant’s Brief]. We held that the warrantless search of the parolee’s residence was invalid. Cullison, 173 N.W.2d at 540-41.
In doing so, we first canvassed the then-existing federal and state caselaw involving rulings under the Fourth Amendment. Id. at 535-36. We noted that the caselaw generally divided into two camps: those courts that either “[s]trip” or “[djilute” a parolee of Fourth Amendment rights and those that afford full validity and recognition of these rights to parolees. Id. at 536.
In Cullison, we strongly disapproved of the strip and dilute cases. See id. We stated that the strip and dilute cases were based upon “what may best be described as a socio-juristic rationalization, i.e., protection of the public and constructive custody” and were not “constitutionally sound, reasonable, fair or necessary.” Id. We stated that the “dilution theory begins and ends nowhere, being at best illusory and evasive.” Id. We quoted with approval a statement in Hernandez, where the court declared that the notion that parolees lose their constitutional rights by accepting parole “makes constitutional rights dependent upon a kind of ‘contract’ in which one side has all the bargaining power” and that “[a] better doctrine is that the state may not attach unconstitutional conditions to the grant of state privileges.” Id. at 536-37 (quoting Hernandez, 40 Cal.Rptr. at 103).
We then turned to the Iowa Constitution. Id. at 537. We noted that article II, section 5 of the Iowa Constitution provides that no “ ‘person convicted of any infamous crime, shall be entitled to the privileges of an elector.’ ” Id. (quoting Iowa Const, art. II, § 5). We recognized that the plain language of article II, section 5 meant that, upon conviction of an infamous offense, the defendant lost his right to vote or hold public office. Id. We then declared: “And certainly, with the exception of lawful conditions governing conduct while on parole or probation, no more onerous burden could be cast upon him by any subsequent conditional release from a penal institution.” Id. at 537-38 (emphasis added). We further noted that “the fact that a criminal accused is also a parolee should not, as to a new and separate crime, destroy or diminish constitutional safeguards afforded all people.” Id. at 538 (emphasis added).
There can be no question that Cullison involves a holding under the Iowa Constitution. The briefing before the Cullison court reveals that the petitioner emphasized article I, section 8 of the Iowa Constitution. According to the appellant’s brief in Cullison, the “Law applicable to this area is found in Iowa Constitution, Art. I, Sec. 8.” Defendant’s Brief at 20. The appellant further argued that “[u]nlike the U.S. Constitution, the Iowa Constitution specifically spells out the result or penalty of felony conviction as far as diminution of constitutional rights are concerned, in ... Article II, Sec. 5.” Id. at 21. Although it is true that the Cullison opinion does not expressly refer to article I, section 8, the Cullison court adopted the appellant’s analysis that article II, section 5 of the Iowa Constitution provides the only sanctions for persons convicted of a *495 crime. 173 N.W.2d at 537-38. A provision of the state constitution has no bearing on the interpretation of the scope of federal constitutional rights. As a result, we stated in Baldón, “[w]ithout expressly saying so, we decided Cullison based on the Iowa Constitution.” Baldón, 829 N.W.2d at 796 n. 2 (majority opinion).
Though brief, the language in Cullison is exceptionally strong and unequivocal. It represents a clear precedent drawing a bright line regarding searches of the home. “[SJoeio-jurisidic” rationales to evade the warrant requirement were unacceptable; the “dilution” theory was “illusory.” See Cullison, 173 N.W.2d at 536. The warrant requirement applied with full force to parolees and, at least in dicta, to probationers as well. See id. at 537-39.
One dissent in Cullison focused on the fact that the search was conducted by a parole officer, and not a law enforcement officer. See id. at 541 (Larson, J., dissenting) (framing the initial question as whether the parole agent or assisting officer can seize stolen property and considering the purposes of the parole system). The dissent believed that a search by a parole officer qualified as one of the exceptions to the warrant requirement. Id. at 543-44 (concluding a parolee has a special status under search and seizure law). The second dissent further emphasized that “[a]n unlawful warrantless search by peace officers does not become legal because they are accompanied by a parole officer.” Id. at 545 (Stuart, J., dissenting). In short, even under the dissents in Cullison, the search in this case by a police officer, and not by a probation officer, would have been invalid.[8]
The holding in Cullison, giving maximum constitutional protection to the home, was consistent with existing federal and state caselaw. See, e.g., Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, 751 (1886) (noting the purpose of the Fourth Amendment is to protect against invasions of “the sanctity of a man’s home and the privacies of life” from “government and its employes”), rejected on other grounds by Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Weeks, 232 U.S. at 390-92, 34 S.Ct. at 343-44, 58 L.Ed. at 654-55 (“[TJhe 4th Amendment ... put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints [and] ... forever secure[d] the people, their persons, houses, papers, and effects, against all unreasonable searches and seizures under the guise of law.”); Agnello, 269 U.S. at 32-33, 46 S.Ct. at 6, 70 L.Ed. at 147-48 (same). In these cases, the United States Supreme Court repeatedly emphasized the historic importance of protecting the home as at the core of Fourth Amendment principles. Indeed, many state and federal courts have favorably cited William Pitt’s famous speech in the House of Commons:
“The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter — all his *496 force dares not cross the threshold of the ruined tenement[.]”
See, e.g., Miller v. United States, 357 U.S. 301, 307, 78 S.Ct. 1190, 1194-95, 2 L.Ed.2d 1332, 1337 (1958); Jonathan L. Jafetz, “A Man’s Home is His Castle?”: Reflections on the Home, the Family, and Privacy During the Late Nineteenth and Early Twentieth Centuries, 8 Wm. & Mary J. Women & L. 175, 175 n. 2 (2002).
Our caselaw contains similar language. As we emphasized in MeClurg v. Brenton:
The mere fact that a man is an officer, whether of high or low degree, gives him no more right than is possessed by the ordinary private citizen to break in upon the privacy of a home and subject its occupants to the indignity of a search for the evidences of crime, without a legal warrant procured for that purpose. No amount of incriminating evidence, whatever its source, will supply the place of such warrant. At the closed door of the home, be it palace or hovel, even bloodhounds must wait till the law, by authorr itative process, bids it open.
123 Iowa 368, 371-72, 98 N.W. 881, 882 (1904). In modern society, probationers and parolees are more likely to live in impoverished neighborhoods. See David J. Harding et al., Home is Hard to Find: Neighborhoods, Institutions, and the Residential Trajectories of Returning Prisoners, 647 Annals Am. Acad. Pol. & Soc. Sci. 214, 216-17, 222 (2013) (finding sixty-six percent of African Americans who lived in high-poverty areas prior to prison moved back to high-poverty areas after prison, and that generally “poor urban communities bear a disproportionate share of the burden” of reintegrating former prisoners). Under the language of MeClurg and the holding in Cullison, the poor cottage or ruined tenement of a parolee (and by implication a probationer) may be unkempt, with lousy heat, running toilets, screens with holes, noisy electric fans for summer relief, and low wattage lighting, but such an abode is still protected by the awesome majesty of the Iowa Constitution from unwarranted searches by government authorities.
Cullison stands for the proposition that the protective arm of article I, section 8 “extends to all alike, worthy and unworthy, without distinction.” State v. Gansz, 297 So.2d 614, 616 (Fla.Dist.Ct.App.1974). As noted by Justice Murphy many years ago,
Rights intended to protect all must be extended to all, lest they so fall into desuetude in the course of denying them to the worst of men as to afford no aid to the best of men in time of need.
Goldman v. United States, 316 U.S. 129, 142, 62 S.Ct. 993, 999, 86 L.Ed. 1322, 1331-32 (1942) (Murphy, J., dissenting), overruled in part by Katz v. United States, 389 U.S. 347, 353, 88 S.Ct. 507, 512,19 L.Ed.2d 576, 583 (1967).
E. Post-Cullison Caselaw. After Cullison, a number of other state courts and federal courts considered this question under the Federal Constitution or state constitutions. Some agreed with our approach in Cullison. For instance, in United States v. Rea, the Court of Appeals for the Second Circuit came to the conclusion that a probation officer is required to obtain a warrant prior to conducting a search of the probationer’s home unless the search fell within one of the judicially recognized exceptions to the warrant requirement. 678 F.2d 382, 386-88 (2d Cir.1982). The Rea court emphasized that there had been “no showing that upholding the warrant requirements for searches of probationers’ homes will seriously impede the accomplishment of the dual law enforcement and rehabilitative goals of probation.” Id. at 387. Similarly, in United States v. Workman, the Court of Appeals for the Fourth Circuit came to the same *497 conclusion, noting that the approach was “consistent with the Supreme Court’s admonition that exceptions to the warrant requirement ‘are few in number and carefully delineated...585 F.2d 1205, 1207 (4th Cir.1978) (quoting U.S. Dist. Ct, 407 U.S. at 318, 92 S.Ct. at 2137, 32 L.Ed.2d at 767), abrogated by Pa. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998), as recognized in United States v. Armstrong, 187 F.3d 392, 394-95 (4th Cir.1999). Other courts, such as the Court of Appeals for the Ninth Circuit, came to a different conclusion. See, e.g., Latta v. Fitzharris, 521 F.2d 246, 252 (9th Cir.1975). Yet, transient political winds blew that emphasized the need for a war on crime and discounted the founder’s principle search and seizure concern: fear of overreaching government.
For many years, the United States Supreme Court in a number of cases has expressed a strong reliance on the Warrant Clause in the Fourth Amendment. What has been called the “warrant preference approach” was closely associated with Justice Felix Frankfurter and Justice Potter Stewart. See generally William W. Greenhalgh & Mark J. Yost, In Defense of the ‘Per Se” Rule: Justice Stewart’s Struggle to Preserve the Fourth Amendment’s Warrant Clause, 31 Am.Crim. L.Rev. 1013 (1994). Under the warrant preference approach, a warrant was generally required, particularly for a home search, except under narrowly defined circumstances, such as searches incident to arrest, or where exigent circumstances make it impossible to obtain a warrant. See id. at 1016-17 (“[A] search is per se unreasonable unless it falls within one of the limited exceptions to the warrant requirement.”). In recent decades, however, the United States Supreme Court has embarked on a series of innovations and reen-gineerings of established Fourth Amendment law that has tended to minimize the role of warrants and emphasize the role of the Reasonableness Clause. See id. at 1084 (“This [ideological] shift has resulted at times in an outright hostility to the ‘per se’ rule in favor of the more flexible standard of ‘reasonableness.’ ”). The newly fashioned Fourth Amendment doctrine provides a framework for the United States Supreme Court to avoid the warrant requirement whenever a majority of the Court determines that it is “reasonable” to do so. See id. (“The Court’s enthusiasm to embrace the flexible ‘reasonableness’ approach is most noticeable in the numerical score: of the fifty-five Fourth Amendment decisions since 1982, the Court has found only twelve searches that violated the Fourth Amendment .... Even more telling, the Court has relied upon the ‘per se’ rule as the framework for resolving only nineteen of those fifty-five Fourth Amendment cases.”). As a result, the warrant requirement under existing United States Supreme Court precedent offers less protection for citizens against arbitrary government intrusions than it did fifty years ago. See id. at 1091 (recognizing the balancing approach has undermined the per se warrant requirement).
The reengineering of Fourth Amendment law is illustrated by the highly divided opinion in Griffin. In Griffin, a five-member majority of the United States Supreme Court concluded that a warrantless search of a probationer’s home by probation officers pursuant to a Wisconsin regulation was “reasonable” under the Fourth Amendment. Griffin, 483 U.S. at 870-71, 880, 107 S.Ct. at 3167, 3172, 97 L.Ed.2d at 715-16, 721-22. The Griffin majority avoided the Warrant Clause by application of a “special needs” doctrine that justified departures from the usual warrant and probable cause requirements. See id. at *498 873-74, 107 S.Ct. at 3168, 97 L.Ed.2d at 717. The Griffin majority based its conclusions, at least in part, on the factual premise that requiring a probation officer to obtain a warrant would be “impracticable.” See id. at 876, 107 S.Ct. at 3169-70, 97 L.Ed.2d at 719.
In its analysis, the Griffin majority emphasized the difference between a probation officer and general law enforcement conducting the search. See id. at 879-80, 107 S.Ct. at 3171-72, 97 L.Ed.2d at 721-22. A search based upon reasonable suspicion instead of ordinary probable cause was permissible, according to the Griffin majority, because the risk of overreaching by a probation officer is less than that when the search is conducted by a police officer whose only mission is to ferret out crime. See id. at 876-79, 107 S.Ct. at 3170-71, 97 L.Ed.2d at 719-20.
The Griffin majority thus moved the search and seizure goalposts twice: first by announcing that, in some instances, a warrant was no longer required for a home search, and second, that a warrantless search could be supported by less than traditional probable cause. See id. at 873-80, 107 S.Ct. at 3168-72, 97 L.Ed.2d at 717-22.
Seemingly recognizing the potential instability of its “reasonableness” approach, the Griffin majority drew a firm line between a search by a probation officer and a search by a general law enforcement officer. See id. at 879-80, 107 S.Ct. at 3171-72, 97 L.Ed.2d at 721-22. As is apparent, the reasoning of the majority in Griffin is consistent with the minority opinion in Cullison, which emphasized that the search was conducted by a probation officer.
Writing for three members of the Court, Justice Blackmun wrote:
I do not think ... that special law enforcement needs justify a modification of the protection afforded a probationer’s privacy by the warrant requirement. The search in this case was conducted in petitioner’s home, the place that traditionally has been regarded as the center of a person’s private life, the bastion in which one has a legitimate expectation of privacy protected by the Fourth Amendment.
Id. at 883, 107 S.Ct. at 3173, 97 L.Ed.2d at 724 (Blackmun, J., dissenting).
Justice Stevens, joined by Justice Marshall, was even more pointed:
Mere speculation by a police officer that a probationer “may have had” contraband in his possession is not a constitutionally sufficient basis for a warrant-less, nonconsensual search of a private home. I simply do not understand how five Members of this Court can reach a contrary conclusion.
Id. at 890, 107 S.Ct. at 3177, 97 L.Ed.2d at 728 (Stevens, J., dissenting).
The United States Supreme Court revisited the general area of search and seizure rights of probationers in Knights. In Knights, the search was conducted by a police officer, not by probation officers as in Griffin. 534 U.S. at 115, 122 S.Ct. at 589, 151 L.Ed.2d at 502-03. The question was whether the line drawn in Griffin would hold. Id. at 117-18, 122 S.Ct. at 590-91, 151 L.Ed.2d at 503-05. It did not. Tossing aside the limiting language in the 5-4 Griffin decision, the Knights Court held that a probationer who signed a probation agreement containing a search condition which stated that he would be subject to a search, which included his residence, at any time and any place, had a “significantly diminished ... expectation of privacy.” Id. at 119-20, 122 S.Ct. at 592, 151 L.Ed.2d at 505. Instead of a limited “special needs” analysis that focused on the value of a warrantless search *499 in promoting the rehabilitation of persons subject to probation, the Supreme Court permitted a search by law enforcement based upon the “totality of the circumstances.” See id. at 118, 122 S.Ct. at 591, 151 L.Ed.2d at 505. As a result, a war-rantless search conducted by law enforcement officers as well as probation officers, at least where police had reasonable suspicion that evidence of a crime would be uncovered, was now permissible under the Fourth Amendment.
While Griffin announced the limiting principle that warrantless home searches were permissible if conducted by a probation officer pursuant to ordinary supervisory activities, 483 U.S. at 879, 107 S.Ct. at 3171, 97 L.Ed.2d at 721, the search and seizure goalposts for warrantless home searches were moved once again in Knights, 534 U.S. at 115, 119-20, 122 S.Ct. at 589, 592, 151 L.Ed.2d at 502-03, 505. The old limiting principle of Griffin based upon “special needs” was simply eliminated. See Knights, 534 U.S. at 122, 122 S.Ct. at 593, 151 L.Ed.2d at 506-07 (finding a warrantless search “supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment”). The ruling in Knights is thus not only inconsistent with the Cullison majority on multiple grounds (no search warrant, no probable cause), but it is also inconsistent with the Cullison minority, which emphasized the fact that the search was conducted by a probation officer.
Finally, the Supreme Court considered Samson v. California, a case addressing the warrantless search of a parolee. 547 U.S. 843, 846, 126 S.Ct. 2193, 2196, 165 L.Ed.2d 250, 255-56 (2006). In this case, a parolee was stopped while walking down a street and subjected to a search, revealing a plastic bag filled with methamphetamine. Id. at 846-47, 126 S.Ct. at 2196, 165 L.Ed.2d at 255-56. In Samson, the Supreme Court again rejected its prior limiting principle of “reasonable suspicion.” See id. at 857, 126 S.Ct. at 2202, 165 L.Ed.2d at 262 (permitting a suspicionless search of a parolee under the Fourth Amendment). In order to reach the desired pragmatic result, the Samson Court declared that the Fourth Amendment involves a continuum of rights. See id. at 850, 126 S.Ct. at 2198, 165 L.Ed.2d at 258. According to the Samson majority, the protections afforded by the Fourth Amendment depend upon a continuum, where parolees have some expectations of privacy; however, these expectations are greatly diminished because parole is the equivalent of imprisonment, while a probationer has a greater interest because probation is ordinarily in lieu of and not in addition to imprisonment. See id. For a parolee who was subject to a search condition like Samson, “reasonable suspicion” was no longer required. See id. at 857, 126 S.Ct. at 2202, 165 L.Ed.2d at 262 (finding a police officer could conduct a suspicionless search of a parolee without violating the Fourth Amendment).
Justice Stevens dissented, writing that the majority’s decision embraced “a regime of suspicionless searches, conducted pursuant to a blanket grant of discretion untethered by any procedural safeguards, [and] by law enforcement personnel who have no special interest in the welfare of the parolee or probationer.” Id. at 857, 126 S.Ct. at 2202, 165 L.Ed.2d at 262-63 (Stevens, J., dissenting). According to Justice Stevens, the new regime announced by the majority was “an unprecedented curtailment of liberty.” Id. Clearly, by departing from even a “reasonable suspicion” requirement, the Supreme Court moved the search and seizure goalposts for a fourth time.
*500 Two propositions are clear from Griffin, Knights, and Samson. First, the United States Supreme Court, beginning in 1981, has developed new Fourth Amendment doctrine that dramatically and substantially undercuts the traditional warrant requirement, probable cause, and particularity requirements of search and seizure law. Second, the new doctrine announced in Griffin, Knights, and Samson is unquestionably, flatly contrary to the approach of this court in Cullison twenty years earlier. In Griffin, Knights, and Samson, the Supreme Court engaged in exactly the kind of “socio-juristic” analysis and “dilution” that the Cullison majority expressly and firmly rejected. Further, even the dissent in Cullison emphasized the fact that a parole officer conducted the search. See 173 N.W.2d at 548-44 (Larson, J., dissenting). The contrast between Cullison and the Griffiro-Knights-Samson line of cases is sharp and unmistakable.
Notwithstanding the Supreme Court’s approach in Griffin, Knights, and Samson, we have not revisited the holding in Culli-son. In Ochoa, we rejected the eviscerating innovation of the Supreme Court in Samson. See Ochoa, 792 N.W.2d at 291. In doing so, we emphasized, among other things, the historic basis of search and seizure law, the sanctity of the home, and the important role of warrants under article I, section 8 of the Iowa Constitution. Id. at 287-91. In Ochoa, we rejected the latest movement of the search and seizure goalposts by the United States Supreme Court.
In Ochoa, the State, with honesty and integrity, declined to claim that the search was supported by reasonable suspicion. See id. at 262-64. As a result, it was not necessary for the Ochoa court to consider whether Griffin or Knights was good law or to reconsider Cullison. See id. at 287 (noting the court could simply affirm Culli-son, but it was not necessary to address the warrant and probable cause requirements when the search was invalid under a reasonableness analysis). It was enough for one day’s work, to simply reject the doctrine of Samson under article I, section 8 of the Iowa Constitution.
In the case before us today, however, there is no question that law enforcement authorities had reasonable suspicion to search Short’s home. The State’s sole claim on appeal is that reasonable suspicion is enough, case closed. Thus, the issue on appeal is squarely presented: is Cullison good law? Or, do we accept instruction from the United States Supreme Court and engage in an innovative reconfiguration of traditional search and seizure law under the Iowa Constitution?
F. Analysis: Should Cullison Be Overruled? The question before us now is whether we should overrule Culli-son. Of course, stare decisis is a factor to consider. At the same time, we recognize that stare decisis is not always determinative. See State v. Bruce, 795 N.W.2d 1, 3 (Iowa 2011). Otherwise, the law would be like a fly imprisoned in volcanic rock.
We begin with a textual look at article I, section 8 of the Iowa Constitution, which provides:
The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.
Iowa Const, art. I, § 8. The text is, of course, nearly identical to the Fourth Amendment to the United States Constitution, which was, in turn, largely modeled after the Massachusetts Constitution of *501 1780. See Ochoa, 792 N.W.2d at 268 n. 7. In-depth modern scholarship has demonstrated that the contemporaneous meaning of the term “unreasonable” in search and seizure law was not the flexible, pragmatic interpretation that we often assign to the term today, but instead a synonym for “unlawful.” See Thomas Y. Davies, Correcting Search-And-Seizure History: Now-Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of “Due Process of Law,” 77 Miss. L.J. 1, 118 (2007) [hereinafter Davies] (recognizing the term “unreasonable” meant to say a warrant was “so illegal that even legislation could not authorize [it]”). Sir Edward Coke opposed general warrants as “ ‘against reason,’ ” again, a reference to their unlawful character. Ochoa, 792 N.W.2d at 269 (quoting Andrew E. Taslitz, Reconstructing the Fourth Amendment: A History of Search & Seizure, 1789-1868, at 37 (2006)). Further, contemporary legal treatises and dictionaries indicated that categories of searches, arrests, and seizures were “unreasonable” and therefore abolished by the Fourth Amendment. See William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning, 602-1791, at 734-35 (2009) [hereinafter Cuddihy]; see also Davies, 77 Miss. L.Rev. at 13 (characterizing the approach of the United States Supreme Court as to “reasonableness” as a modern invention that engages in relativistic balancing of individual rights and reflects relatively recent, ideologically driven judicial choices, not a rendition of original understanding, and urging state courts to engage in authentic search and seizure history).
But textualists will also note that unlike accepted versions of the Fourth Amendment, article I, section 8 utilizes a semicolon between the reasonableness clause and the warrant clause. As pointed out in Ochoa, a semicolon ordinarily is used to show that the language that follows the semicolon illustrates the basic principle, namely, that in order to avoid being declared “unreasonable” or unlawful, under article I, section 8, a warrant is ordinarily required. See 792 N.W.2d at 268-69.
Indeed, the notion that in order for a search to be reasonable, it must be pursuant to a warrant has considerable historical support. James Otis, in his brief in Paxton’s Case, asserted that only specific warrants were reasonable and that “ ‘the freedom of one’s house’ was among ‘the most essential branches of English liberty.’ ” Cuddihy at 377-78 (citation omitted). Similarly, shortly before Iowa obtained statehood, a state court held that in order for a search to be reasonable, it had to be executed pursuant to a warrant. See Banks v. Farwell, 38 Mass. (21 Pick.) 156, 159 (1838). While these historical lines of inquiry do not necessarily provide the rule of decision in concrete cases involving unforeseen circumstances, the historical record does offer insight into the meaning of constitutional values that must be applied to modern circumstances.
There are also structural reasons for defending the warrant requirement. As we indicated in Ochoa, an interpretation that focuses on the reasonableness clause as the touchstone of search and seizure law sets up the intellectual machinery to engulf the warrant clause and make its mandatory provision ephemeral. See 792 N.W.2d at 269. The search and seizure protections of article I, section 8 would be subject to reasonability determinations by shifting four-member majorities of this court, based upon pragmatic considerations. Members of this court — indeed any court — can come up with ingenious explanations of how just about any search is reasonable. Cf. Skinner v. Ry. Labor Execs.’Ass’n, 489 U.S. 602, 637, 109 S.Ct. 1402, 1424, 103 L.Ed.2d 639, 672-73 *502 (1989) (Marshall, J., dissenting) (noting that absent warrant and probable cause standards, concept of reasonableness is “virtually devoid of meaning, subject to whatever content shifting judicial majorities, concerned about the problems of the day, choose to give to that supple term”). The cautionary words of Anthony Amsterdam in his classic study on the Fourth Amendment that reliance on reasonability threatens to convert “the [Fjourth [Ajmendment into one immense Rorschach blot” has even greater urgency today than it did forty years ago. See Anthony Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L.Rev. 349, 393 (1974) [hereinafter Amsterdam].
Indeed, rejection of this kind of slippery reasoning was at the very heart of Culli-son, which declared that socio-jurisdic requirements to evade the constitutional command of the need for a search warrant were unacceptable. 173 N.W.2d at 536; see also Griffin, 483 U.S. at 890, 107 S.Ct. at 3177, 97 L.Ed.2d at 728 (Stevens, J., dissenting) (expressing surprise that five members of the Supreme Court would overrule the probable cause and warrant requirements in the context of a search of a probationer by probation officers). As a result, we have little interest in allowing the reasonableness clause to be a generalized trump card to override the warrant clause in the context of home searches and reject the cases suggesting otherwise.
It is of course true that in this case, law enforcement officers had reasonable suspicion, at least as established at the hearing on the motion to suppress. Short does not suggest otherwise. A requirement of individualized suspicion, as indicated in Ochoa, can be an important factor in preventing arbitrary searches and seizures by law enforcement, and our refusal to accept the Samson approach under article I, section 8 of the Iowa Constitution was an important development in our law.
It is tempting, perhaps, to say that in this case, where the record shows that law enforcement had good reason to conduct the search, that the constitutional requirements have been satisfied. But article I, section 8 does not speak solely in terms of probable cause. Irrevocably welded into article I, section 8 are requirements that a warrant be issued by a neutral magistrate that limits the scope of the search both with respect to places to be searched and items to be seized. The warrant and particularity requirements of article I, section 8 are not weak siblings of the probable cause requirement. By requiring approval of a neutral magistrate and a description with particularity, important constitutional values are promoted. By involving a neutral magistrate, the warrant requirement ensures that probable cause is evaluated not by overzealous law enforcement officers. The traditional view has been that “ ‘the procedure of antecedent justification ... is central to the Fourth Amendment.’ ” See Katz, 389 U.S. at 359, 88 S.Ct. at 515, 19 L.Ed.2d at 586 (footnote omitted). As noted by Justice Jackson in Johnson:
The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable [people] draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate’s disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people’s homes *503 secure only in the discretion of police officers.
333 U.S. at 13-14, 68 S.Ct. at 369, 92 L.Ed. at 440 (footnote omitted).
In addition, the particularity requirement limits the scope of the search, which is often as important to the protection of constitutional rights as the authorization of the search itself. As noted in Arkansas v. Sanders:
In the ordinary case ... a search of private property must be both reasonable and pursuant to a properly issued search warrant. The mere reasonableness of a search, assessed in the light of the surrounding circumstances, is not a substitute for the judicial warrant [requirement] ....
442 U.S. 753, 758, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235, 241 (1979), overruled on other grounds by Acevedo, 500 U.S. at 579, 111 S.Ct. at 1991, 114 L.Ed.2d at 633-34. In addition, the process of obtaining a warrant prevents the possibility of posthoc rationales. With a written application and a warrant issued by a magistrate, we can look to the documented record in evaluating the lawfulness of. a search, thereby steaming out many credibility issues associated with inquiries about who said what to whom and when.
Our recognition of the importance of all of the requirements of the warrant clause is demonstrated in Cline. See 617 N.W.2d at 281-82. A majority of state courts that have considered the question under search and seizure clauses of their state constitutions, refused to recognize the new good faith exception to the exclusionary rule in the search and seizure context created by the United States Supreme Court in United States v. Leon, 468 U.S. 897, 922-25, 104 S.Ct. 3405, 3420-22, 82 L.Ed.2d 677, 698-700 (1984). See, e.g., State v. Marsala, 216 Conn. 150, 579 A.2d 58, 65 (1990); State v. Guzman, 122 Idaho 981, 842 P.2d 660, 667-68 (1992); State v. Novembrino, 105 N.J. 95, 519 A.2d 820, 856-57 (1987); State v. Gutierrez, 116 N.M. 431, 863 P.2d 1052, 1068 (1993); People v. Bigelow, 66 N.Y.2d 417, 497 N.Y.S.2d 630, 488 N.E.2d 451, 457-58 (1985); Edmunds, 586 A.2d at 895 (Pa.1991); State v. Oakes, 157 Vt. 171, 598 A.2d 119, 126-27 (1991). Our court refused as well. Cline, 617 N.W.2d- at 292-93. We refused to allow evidence obtained as a result of purportedly minor defects in searches and seizures. See id. The constitutional protections of article I, section 8 were simply too important for a “close enough” mentality. See id. at 290. As noted by Justice Frankfurter many years ago, “[t]he history of liberty has largely been the history of observance of proeeclural safeguards.” McNabb v. United States, 318 U.S. 332, 347, 63 S.Ct. 608, 616, 87 L.Ed. 819, 827-28 (1943).
Even if we were inclined to fuzzy up the warrant requirement, a home invasion by law enforcement officers is the last place we would begin the process.. The canard that a person’s home is their castle has always been subject to some limitations, but the basic principle remains a sound one. We are not talking about a routine encounter at airport security where the announced and understood purpose of the examination is safety of passengers unrelated to the goals of general law enforcement, or an investigative stop on the street where a quick pat down is conducted to ensure the safety of police officers, or an exigent circumstance where the acquisition of a warrant was simply not possible. Here, police officers are penetrating a home, the place of final refuge, the focal point of intimate relationships, and what is constitutionally, thought of as a place of safety, security, and repose. Of course, no one says such an invasion can never occur, but only that a warrant, supported by probable .cause, describing the place to be *504 searched and the things to be obtained with particularity, is required.
Sometimes, eviscerations of constitutional protections are based upon claims that a probationer has a lesser expectation of privacy. Such reasoning is generally based upon a misreading of Justice Harlan’s concurring opinion in Katz. See 889 U.S. at 360-62, 88 S.Ct. at 516-17, 19 L.Ed.2d at 587-88 (Harlan, J., concurring). However, the expectation of privacy test in Justice Harlan’s concurrence in Katz was designed to expand, and not contract, constitutional protections. Id. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 587-88. Even Justice Harlan as the author of the concurring opinion objected to its later applications. See United States v. White, 401 U.S. 745, 786-87, 91 S.Ct. 1122, 1143, 28 L.Ed.2d 453, 478 (1971) (Harlan, J., dissenting) (stating intrusions significantly jeopardizing Fourth Amendment liberties should require a warrant). And it simply cannot be said that the government, by simply announcing that warrantless searches may occur, can eviscerate the right to be left alone inherent in article I, section 8. Cf. State v. Campbell, 306 Or. 157, 759 P.2d 1040, 1044 (1988) (noting that the phrase “expectation of privacy” expresses a conclusion rather than a starting point and that Oregon search and seizure law protects not the privacy one reasonably expects but the privacy to which one has a right); State v. Tanner, 304 Or. 312, 745 P.2d 757, 762 n. 7 (1987) (citing Amsterdam, 58 Minn. L.Rev. at 384). If a government announcement that a citizen is no longer free from unwarranted home search overrode the requirements of article I, section 8, citizen protections would be dramatically undermined. Further, the expectation of privacy analysis was not designed to supplant other constitutional values protected by search and seizure law, including the right to be secure in one’s home from trespass by law enforcement. See Ochoa, 792 N.W.2d at 277 (recognizing a continued notion of property and security in Fourth Amendment protections). While we recognize that the probation agreement provided Short with notice that the State asserted the right to execute warrantless searches, we do not think notice eviscerates the warrant requirement for home searches. Cf. Samson, 547 U.S. at 863, 126 S.Ct. at 2206, 165 L.Ed.2d at 266 (Stevens, J., concurring) (rejecting reliance on a condition or notice in parole agreement because otherwise, the government could “ ‘suddenly ... announce on nationwide television that all homes henceforth would be subject to warrantless entry1 ”); Campbell, 759 P.2d at 1044 (noting that the majority opinion in Katz does not use the phrase “reasonable expectation of privacy” and under the Oregon Constitution emphasizing privacy to which one has a right). Cullison rejected reasoning designed to strip or dilute constitutional protections for probationers home searches. See 173 N.W.2d at 536. So should we.
We further note that the requirements imposed by article I, section 8 and enforced by us, namely, that a warrant is required for an unconsented search of the home, even of a parolee or probationer, is not terribly onerous. Indeed, the balancing of interests between the individual and law enforcement has already occurred in article I, section 8 in the probable cause requirement. As we have noted in the past:
The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating ... opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officer’s whim or caprice.
*505 State v. Raymond, 258 Iowa 1339, 1345, 142 N.W.2d 444, 447 (1966) (internal quotation marks omitted).
That leaves the additional constitutional requirements of obtaining a warrant from a neutral magistrate describing the place to be searched and the things to be sought with particularity. Whatever else may have been true in the past, obtaining a warrant from a judicial officer is not particularly onerous. As was noted by a leading commentator almost twenty years ago, there is now no reason why warrants cannot be obtained twenty-four hours a day using modern technologies. Craig M. Bradley, Two Models of the Fourth Amendment, 83 Mich. L.Rev. 1468, 1492-93 (1985).
The factual assertion in Griffin that it was impracticable for a probation officer to obtain a warrant was wrong then and it is even more wrong today. See Howard P. Schneiderman, Conflicting Perspectives from the Bench and the Field on Probationer Home Searches — Griffin v. Wisconsin Reconsidered, 1989 Wise. L.Rev. 607, 664 (1989) (noting survey results demonstrating that a warrant requirement would not unduly burden Wisconsin probation department). And, the impracticable assertion has even less validity in the context of a search by law enforcement. As demonstrated by this case, the problem was not that it was impractical to obtain a warrant. It was very practical to obtain a warrant. The problem was that the warrant actually obtained was invalid and the State failed, through an apparent misunderstanding of the law, to properly obtain a new warrant. In this case, a valid, amended warrant could have been acquired with only modest additional effort by law enforcement.
In addition, we do not address the validity of home visits and other measures utilized by probation or parole officers as part of their ordinary duties. Although Cullison plainly indicates that even a search by a parole officer may give rise to a violation of article I, section 8, 173 N.W.2d at 539-40, we reserve this interesting question for another day. We prefer to consider the law step by step rather than by leaps and bounds. There is substantial authority, for instance, for the proposition that while evidence obtained through home visits, or searches by probation officers, may not be used in new criminal prosecutions, it may be used for purposes of establishing a violation of probation or parole. Indeed, this was the point of the Cullison dissent. 173 N.W.2d at 543-44 (Larson, J., dissenting) (stating a parole agent should have a duty to conduct the search when he or she believes the parolee is violating parole). Because this case does not involve the activities of a probation officer conducting ordinary supervision of a probationer, we need not consider issues that arise from such a factual setting.
It is an undeniable fact that in search and seizure cases, the people who bring the cases are generally those “whose unlawfully searched premises contained actual evidence of the actual crime they actually committed.” Frederick Schauer, The Heroes of the First Amendment, 101 Mich. L.Rev. 2118, 2118 (2003). But the law must be that a search of a home “is not to be made legal by what it turns up. In law, it is good or bad when it starts and does not change character from its success.” United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 229, 92 L.Ed. 210, 220-21 (1948) (footnote omitted).
As noted by Justice Frankfurter many years ago, “[i]t is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people.” United States v. Rabinowitz, 339 U.S. 56, 66, 70 S.Ct. 430, 436, 94 L.Ed. 653, 660-61 (1950) *506 (Frankfurter, J., dissenting), overruled in part by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). In reflecting on Justice Frankfurter’s observation, Alfred Carlton, a past president of the American Bar Association, noted that “Judges inevitably must bear the brunt of this, and judicial independence is the cloak that allows them to do it.” Alfred P. Carlton Jr., Preserving Judicial Independence — An Exegesis, 29 Fordham Urb. L.J. 835, 841 (2002). Carlton further warned against “[ijntemperate, inaccurate, and emotional criticism” arising from such cases that “undermines public confidence in the impartiality of the judiciary and hence its independence.” Id.
We also pause to reflect on the observation in Kopfv. Skyrm:
But Casella was a criminal. He deserved to be arrested and punished; his story stirs little sympathy, much less outrage, in the crowd. The courts cannot be so impassive. We must always remember that unreasonable searches and seizures helped drive our forefathers to revolution. One who would defend [search and seizure law] must share his foxhole with scoundrels of every sort, but to abandon the post because of the poor company is to sell freedom cheaply.
993 F.2d 374, 379-80 (4th Cir.1993).
For the above reasons, we think Cullison remains good law. We decline to overrule it.[9] The United States Supreme Court in Griffin, Knights, and Samson has engaged in innovations that significantly reduce the protections of the Warrant Clause of the Fourth Amendment. We decline to join the retreat under the Iowa Constitution. We hold that under article I, section 8, the warrant requirement has full applicability to home searches of both probationers and parolees by law enforcement. As a result, because evidence seized in this case was obtained unlawfully, the motion to suppress should have been granted. We again note that we do not address the legality of home visits or other types of supervision by probation officers pursuant to their ordinary functions, nor do we address the question of whether a probationer may validly consent to warrantless home searches.
VI. Conclusion.
More than forty years ago in Cullison, this court held that under the search and seizure provision of article I, section 8 of the Iowa Constitution, a valid warrant is required for law enforcement’s search of a parolee’s home. In this case, the State does not claim there was a valid warrant. In the subsequent decades, the United States Supreme Court has moved away from its reliance on warrants toward and emphasis on standalone reasonability in its interpretation of the search and seizure provisions of the Fourth Amendment. We decline to adopt this innovative reasoning. We find Cullison remains good law and decline to disturb it. As a result, the search by general law enforcement authorities of the home in this case was unlawful under article I, section 8 of the Iowa Constitution. We conclude the district court erred in denying the motion to suppress.
DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT *507 JUDGMENT REVERSED AND CASE REMANDED.
All justices concur except CADY, C.J., who concurs specially, and WATERMAN, MANSFIELD, and ZAGER, JJ., who dissent, each writing separately.

. In its brief, the State contends that Short “acknowledged his ‘significantly diminished’ expectation of privacy by signing [the] probation agreement,” which included a "condition” that Short would " ‘submit [his] person ... [and] place of residence ... to search at any time, with or without a search warrant ... by any ... law enforcement officer having reasonable grounds to believe contraband is present.' ”

. For instance, a leading treatise explains the majority view is that consent provisions apply only to searches by parole or probation officers and not to searches by police officers, but also cites cases to the contrary. William E. Ringle, Searches and Seizures, Arrests and Confessions § 17:8 & n. 31, at 17-32 (2d ed.2004). At least two cases hold that search provisions in probation conditions are coerced and cannot be enforced. See People v. Peterson, 62 Mich.App. 258, 233 N.W.2d 250, 255 (1975); Tamez v. State, 534 S.W.2d 686, 692 (Tex.Crim.App.1976). Yet another court has ruled that a probation condition may be enforced only to the extent there is reasonable suspicion and when traditionally a search warrant has not been required. Commonwealth v. LaFrance, 402 Mass. 789, 525 N.E.2d 379, 383 (1988). Another approach is that court-ordered probation conditions may permit warrantless searches, but the evidence is admissible only in a probation proceeding. Grubbs v. State, 373 So.2d 905, 909-10 (Fla. 1979). In another case, the court emphasized that search and seizure conditions on probation should be "sparingly imposed and ... reasonably related to the offense for which the defendant was convicted” and that where this requirement was met, and the condition was clearly explained to him before signing, the provision was enforceable. State v. Morgan, 206 Neb. 818, 295 N.W.2d 285, 288-89 (1980). Another court has suggested that search and seizure provisions in probation agreements may be valid "except when procured by fraud, duress, fear, or intimidation or when it is merely a submission to the supremacy of the law.” Rivera v. State, 667 N.E.2d 764, 766 (Ind.Ct.App.1996). There is no factual record and no briefing before us that would allow us to explore these interesting permutations of the consent issue.

.No party, for instance, asks us to revisit Racing Ass’n of Central Iowa v. Fitzgerald, 675 N.W.2d 1 (Iowa 2004), Ochoa, 792 N.W.2d 260, State v. Pals, 805 N.W.2d 767 (Iowa 2011), or State v. Baldon, 829 N.W.2d 785 (Iowa 2013).

. We will refer to the Iowa Constitution of 1857 as the Iowa Constitution.

. As explained by Shambaugh, the bill of rights set forth in the Constitution of the Territory of Iowa was "exceedingly brief” and consisted solely of incorporation of the rights, privileges, and immunities granted to the Territory of Wisconsin. See Benjamin F. Sham-baugh, The History of the Constitutions of Iowa 116 (1902). The Constitution of the Territory of Wisconsin, in turn, incorporated the provisions of the Northwest Ordinance of 1787, which contained a bill of rights. Id. at 116-17. As a result, "the provisions of the Ordinance of 1787 are by implication made part of the Constitution of the Territory of Iowa.” Id. at 117-18.

. Other commentators have expressed similar criticism of Federal Fourth Amendment jurisprudence. See, e.g., Ronald J. Allen & Ross M. Rosenberg, The Fourth Amendment and the Limits of Theory: Local Versus General Theoretical Knowledge, 72 St. John’s L.Rev. 1149, 1149 (1998) (“a mess"); Craig M. Bradley, Two Models of the Fourth Amendment, 83 Mich. L.Rev. 1468, 1468 (1985) (“a mass of contradictions and obscurities”); Thomas K. Clancy, The Fourth Amendment's Concept of Reasonableness, 2004 Utah L.Rev. 977, 978 (2004) ("irreconcilable”); Jennifer Friesen, State Courts as Sources of Constitutional Law: How to Become Independently Wealthy, 72 Notre Dame L.Rev. 1065, 1092 (1997) ("illogical and unwieldy”); Orin S. Kerr, Four Models of Fourth Amendment Protection, 60 Stan. L.Rev. 503, 504-05 (2007) ("remains remarkably opaque”); Erik G. Luna, Sovereignty and Suspicion, 48 Duke L.J. 787, 787-88 (1999) ("more duct tape on the Amendment’s frame and a step closer to the junkyard”); Donald R.C. Pongrace, Stereotypification of the Fourth Amendment’s Public/Private Distinction: An Opportunity for Clarity, 34 Am. U.L.Rev. 1191, 1208 (1985) ("in a state of theoretical chaos”); Daniel J. Solove, Fourth Amendment Pragmatism, 51 B.C. L.Rev. 1511, 1511 (2010) ("riddled with inconsistency and incoherence”); David E. Steinberg, The Uses and Misuses of Fourth Amendment History, 10 U. Pa. J. Const. L. 581, 581 (2008) ("doctrinal incoherence of Fourth Amendment law” "disturbs many judges and scholars”); Silas J. Wasserstrom & Louis Michael Seidman, The Fourth Amendment as Constitutional Theory, 77 Geo. L.J. 19, 29 (1988) ("inconsistent and bizarre results”); and Richard G. Wilkins, Defining the ''Reasonable Expectation of Privacy": An Emerging Tripartite Analysis, 40 Vand. L.Rev. 1077, 1107 (1987) ("distressingly unmanageable”).

. For instance, many state courts, including Iowa, have on remand from a reversal by the United States Supreme Court on federal constitutional issues, followed their previous reasoning under the state constitution. See, e.g., Racing Ass’n of Cent. Iowa, 675 N.W.2d 1, 4-7; Sitz v. Dep’t of State Police, 443 Mich. 744, 506 N.W.2d 209, 216-17 (1993); State v. Opperman, 247 N.W.2d 673, 674-75 (S.D.1976).

. This case, of course, involves a probationer and not a parolee. Even under the United States Supreme Court’s Fourth Amendment cases, however, a probationer has more protection from searches and seizures than does a parolee. See Samson v. California, 547 U.S. 843, 850, 126 S.Ct. 2193, 2198, 165 L.Ed.2d 250, 258 (2006) (recognizing parole is more akin to imprisonment thus parolees have fewer expectations of privacy). Cullison thus cannot be distinguished on the basis that it involved a parolee who, if anything, had lesser search and seizure rights than a probationer.

. We note, according to the Bureau of Justice Statistics, in 2012 there were 29,333 Iowans on probation. See Bureau of Justice Statistics, U.S. Department of Justice, NCJ243826, Probation and Parole in the United States, 2012, app. tbl. 2 (revised Apr. 22, 2014), available at www.bjs.gov/content/pub/pdf/ppusl2. pdf. The consequences of a contrary result in this case would be that the homes of those persons could be subject to warrantless searches by law enforcement.