## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF IOWA.

### JULY TERM 1839.

Hon. CHARLES MASON, Chief Justice.
" JOSEPH WILLIAMS, } Associate Judges.
" THOMAS S. WILSON, }

---

## In the matter of Ralph (a colored man,) on Habeas Corpus.

Where a slave goes with the consent of his master to become a permanent resident of a free State, he cannot be regarded as a fugitive slave.

The act of 1820, for the admission of Missouri into the Union, which prohibits slavery north of 36 deg., 30 min., was not intended merely as a naked declaration, requiring further legislative action to carry it into effect, but must be regarded as an entire and final prohibition.

The master, who subsequently to this act, permits his slave to become a permanent resident here, cannot afterwards exercise any acts of ownership over him within this Territory.

Ralph being within this Territory was claimed by Montgomery, a resident of Missouri, as his slave, and by virtue of a precept from a Justice of the Peace, and certain proceedings pursuant to statute, being had before him, the sheriff of Du Buque county delivered the negro into the custody of the claimant, for the purpose of being transported to Missouri.

Ralph was afterward brought before the Judge of the 3d district by a

writ of Habeas Corpus, from whence, by consent of parties, the proceedings were transferred to the Supreme Court upon an agreed state of facts, in substance as follows:

That in 1834, Ralph being the slave of the claimant, a written agreement was entered into between them, by which Ralph was permitted to come into this Territory to reside—he, on his part stipulating to pay the claimant the sum of $550 with interest from the 1st of January 1835, as the price of his freedom, that it was to earn the purchase money for his freedom—that he then left Missouri and came to Du Buque, where he remained working in the lead mines, until the time of the proceedings before the Justice, and that having failed to comply with his contract of payment, he was reclaimed by his former master.

RORER for the claimant contended:

1. That Ralph, being a resident of the Territory of Wisconsin, at the time both of the PASSAGE AND TAKING EFFECT of the Organic Law of that Territory—and also a resident of Iowa Territory, at the time of the passage and taking effect of the organic law of Iowa Territory, he became FREE by operation of the 12th section of said Organic Laws, which expressly extend to the inhabitants of said Territories of Iowa and Wisconsin, the benefits of the Articles of Compact contained in the Ordinance for the Government of the Territory north west of the river Ohio, by which the benefit of the writ of Habeas Corpus (the remedy here sought) is guarantied to the inhabitants of said Territories north west of Ohio—and which also declares, "No man shall be deprived of his liberty, or property, but by the judgement of his peers, or the law of the land."—(See 2d Article of Compact, contained in the Ordinance of Congress of 1787.) And that "There shall be neither slavery, nor involuntary servitude, in the said Territory—otherwise than in the punishment of crimes whereof the parties shall have been duly convicted." (See 6th Article of said Compact.")

2. That, independent of the Articles of Compact and Organic Laws above cited, Ralph became free so soon as, by consent of his master, he became an inhabitant of what is now the Territory of Iowa, by virtue of the Act of Congress, entitled—"An Act to authorize the people of Missouri Territory to form a Constitution and State Government, and for the admission of such State into the Union, on an equal footing with the original States, and to prohibit slavery in certain Territories:"—By which it is declared, that "In all that territory ceded by France to the

United States, under the name of Louisana, which lies north of thirty-six degrees, and thirty minutes north latitude, not included within the limits of the State contemplated by this act; slavery and involuntary servitude, otherwise than in the punishment of crimes, whereof the parties shall have been duly convicted, shall be, and is hereby, forever prohibited."—(*See 8th Section of said Act. I.ig. Digest of Laws of U. S. of America*—614.)—That the present Territory, being part of the country subjected to such prohibition, the petitioner, as there is no law by which he can be removed elsewhere, is FREE in the exercise of his right to remain here. Where a West India Slave came to England with his master, and again returned with him to the West Indies, it was held, that although he was still subject to servitude on his return to the Indies, yet "no coercion could be exercised over him while in England."—(*2d Hagg. Adm. Rep.* 91—*2d Kent's Com. note to page* 2 19.—The claimant cannot possess any natural right to remove the petitioner to where he may, by the aid of human law, be reduced again to slavery—for such a state is declared to be 'repugnant to reason and the principles of Natural Law.'—(*See Blac. Com. vol. 1st p.* 423 )

And still stronger is the language of much earlier and higher authority;—in the divine writings of Moses, it is said, "Thou shalt not deliver unto his master the servant which is escaped from his master unto thee," &c.—*22d Chap. Deut.* 15*th verse.*) But this is not a case of an 'escape,' but emigration by consent of the master.

3. That he cannot be considered as either coming into, or remaining in the Territory in violation of the law prohibiting persons of color from settling in this Territory, without evidence of freedom, &c.; for it is in evidence that he was here at the time of, and previous to, the organization of the Territorial Government, and even at the time of the first extension of civil government over the country, by the act of Congress of 1834, attaching it to the then Territory of Michigan for temporary government.

4. That he cannot be reclaimed and delivered over to his former owner under our statute, nor under the laws, ordinance, or constitution of the United States, providing for the re-taking of fugitive slaves who have escaped from service; for it is in evidence that he came to, and remained in the Territory, not as a fugitive from service, to which he was then legally holden in some State of the Union, but by the voluntary consent and agreement of his former owner, the present claimant.

5. That the claimant, Montgomery, by permitting his slave to come to that portion of the Territory of the United States in which slavery was

then, and still is, prohibited, for the purpose of remaining indefinitely, virtually manumitted such slave—that the very fact of his contracting with, presupposes a state of freedom on the part of the slave—that if Montgomery has any relief, it is on that contract, for the money agreed to be paid, which is neither conceded here, nor deemed in any manner essential to the adjudication of this question, which is a question entirely of freedom.

Lee *versus* Lee, 8 Peter's Rep. 44—Fanny *versus* Montgomery and Others, Breese's Reps. 188.—Act of Virginia for Cession of Northwest Territory, 5th vol. Laws U. S. A. 473.—John Merry *versus* Tiffin and Menard, 1 vol. Misso. Rep. 725.—Winny *versus* Whitesides, *ib.* 472. Ralph *versus* Duncan, 3d Misso. Rep. 194.—Julia *versus* Samuel Mc-Kinney, *ib.* 270.—1st Blac. Com. 127, *ib* 423, 424, 425.—2d of Kent's Com. 247, 248, 249.—Case of Somerset, 11 vol. State Trials, p. 339. —Lofts' Reps. 1.—Case of Knight, a negro Slave, in 1778.—Kame's Principles of Equity, vol. 2d, 134.

LEARNED & BERRY for Montgomery insisted,

1st. That Ralph having failed to perform his part of the contract, by paying the price of his freedom, was to be regarded as a fugitive slave, and as such might be claimed by virtue of the act of Congress.

2. That slavery was not prohibited in this Territory; the act of 1820, for admitting Missouri into the Union, which contained a prohibition of slavery north of 36 deg., 30 min., not being intended to take effect on the rights of individuals without further legislative action, but merely ment to direct the local legislatures to pass laws prohibiting slavery within the described limits, that the act of Congress contained no sanction, and consequently, had no binding force—that even if the act was intended to operate without further legislation, it did not work a forfeiture of slave property, and would in this case go no further than merely to require the claimant to remove his property out of the Territory; that the case was similar in some respects, to that of property invested in private banking, contrary to the provisions of the statute, where, although the owner might be made liable, the property would not be confiscated.

BY THE COURT, MASON CHIEF JUSTICE.—This case does not come before us in any of the ordinary methods of application to an appellate Court, so that it is, perhaps, not strictly regular for us to entertain jurisdiction of it at all. As, however, it involves an important question,

which may ere long, if unsettled, become an exciting one, and as it is by the mutual assent and request of all the parties interested, we concluded to listen to the argument, and make a decision in the case without intending it as a precedent for the future practice of this Court.

The petitioner, a colored man, who was claimed as a slave before the Justice of the Peace, and who was about to have been delivered up accordingly, asserts that he is free. If this be actually the case, the writ of *Habeas Corpus* was properly brought, being the only means by which the Judge of the District Court could exercise a remedial control over the illegal acts of Justices of the Peace, in cases like this. The proceedings having been transferred to this court, it will be proper for us to make such a disposition of the matter as might have been made by the District Judge while the subject was before him.

The claimant asks that the petitioner be restored to him as a slave, and principally for the following reasons:—In the first place, that, by the Act of Congress of 1820, which authorized the people of Missouri to form a Constitution and State Government, and which prohibited slavery in all that portion of the old Louisiana Territory lying north of thirty-six degrees and thirty minutes of north latitude, not included within the then contemplated State, it is provided "That any person escaping into the Territory thus set apart, from whom labor or service is lawfully claimed, in any State or Territory of the United States, such fugitive may lawfully be reclaimed and conveyed to the person claiming his said labor or services." Under this provision, we are called upon to decide that the petitioner is a fugitive slave, because, although the master consented that he should come to this territory, and, for aught that appears, remain here for four or five years, still there was an express stipulation that he should, at some future time, pay to his former master, the sum of five hundred dollars, with interest—that, not having complied with this agreement, he is to be regarded as being here without permission, and, consequently, as having escaped into the Territory.

Such a construction would introduce almost unqualified slavery into all the free States. The Constitution of the United States contains a provision in relation to fugitive slaves, substantially the same as that embraced in the Act of Congress above referred to; so that in this particular, all the free States of the Union are in the same predicament as this Territory. Suppose, then, the southern master should permit his slave to emigrate to some of the free States, upon the express condition that he should remain forever the slave, or (which is the same thing) the submissive servant of some particular individual, his heirs and assigns.

While he fulfils this agreement, he is a slave to his new master in the North, and, as soon as he violates it, he becomes again the slave of his old one at the South, who may, forthwith, reclaim him as a fugitive. We cannot countenance such a doctrine.

From the facts agreed upon in this case, it seems that the claimant permitted his slave to come to this Territory. The permission seems to have been absolute; but there was also an understanding that the latter was to pay the former a certain amount, as the price of his freedom. How the failure to comply with this understanding could render a removal, undertaken with the master's consent, an escape, we are unable to comprehend. The petitioner is under the same obligation to fulfil this engagement as though, instead of its being the price of his freedom, the debt had been incurred for the purchase of any other species of property. It is a debt which he ought to pay, but for the non-payment of which no man in this territory can be reduced to slavery.

We do not say there can be no escape where the slave goes to a free State by the consent of the master: If, sent upon an errand, or travelling in company with his master, he should refuse to return, he might probably be regarded as a fugitive. But this certainly cannot be the case where the journey was undertaken with the understanding of all parties that the slave was going to become a permanent resident of the free State or Territory.

But it is contended, on the part of the claimant, that slavery is not prohibited in this Territory—that the Act of 1820, above-mentioned, is a mere naked declaration, requiring further legislation to render it operative—that it merely imposes a duty on the States and Territories to be formed within the prescribed limits, but that, without further action on the subject, the law has no sanction, and, consequently, no force. This position, we think, cannot be maintained. Congress possesses the supreme power of legislation in relation to the Territories, and its right to prohibit slavery, at least in relation to slaves subsequently introduced, is doubtless legitimate. Has that right been exercised in relation to this Territory? The language of the Act of 1820, in relation to the district of country in which this Territory is embraced, is, that slavery therein " shall be, and is hereby, forever prohibited." This seems to us an entire and final prohibition, not looking to future legislative action to render it effectual.

But it is said that, although the act may prohibit slavery, it does not declare a forfeiture of slave property, and that the most which the law will authorize will be, to require the master to remove that

property out of the Territory. It is true that the Act, thus mentioned, does not, in express terms, declare a forfeiture of slave property, but it does, in effect, declare that such property shall not exist.

The master who, subsequently to that Act, permits his slave to become a resident here, cannot, afterwards, exercise any acts of ownership over him within this Territory. The law does not take away his property in express terms, but declares it *no longer to be property* at all. Of course those legal remedies, which can only be resorted to upon *the presumption of a still subsisting ownership in the master,* become altogether annihilated.

A wide difference exists between the present case and that supposed in the argument, of an act of the Legislature prohibiting private banking. In the latter case the property invested in that traffic, in violation of the law, would not, in general, become forfeited. But suppose that, instead of prohibiting the investment of property in private banks, the Act should declare that property, so invested, should cease to be the subject of property at all, (and suppose a physical capability in the law to carry out that declaration) could the former owner, after such investment, invoke the aid of the laws to restore him what had once been his, but which was now, like the air, rendered incapable of being appropriated by any one? Such is precisely, the state of things in the case now before us. Property, in the slave, *cannot exist without the existence of slavery:* the prohibition of the latter annihilates the former, and, this being destroyed, he becomes free.

Could the claimant, in this case, retain the custody and control of the petitioner, without invoking the aid of our laws, and without their violation, we certainly should not interfere to prevent him. But when he applies to our tribunals for the purpose of controlling, as property, that which our laws have declared shall not be property, it is incumbent on them to refuse their co-operation. When, in seeking to accomplish his object, he illegally restrains a human being of his liberty, it is proper that the laws, which should extend equal protection to men of all colors and conditions, should exert their remedial interposition. We think, therefore, that the petitioner should be discharged from all custody and constraint, and be permitted to go free while he remains under the protection of our laws.