CADY, Chief Justice (dissenting).
I respectfully dissent from the decision of the majority to continue to address claims of pretextual traffic stops without considering the subjective motives of the officer involved once probable cause is found. Our law must, instead, prohibit pretextual traffic stops motivated by race or any other classification, even when probable cause for a traffic violation exists. They are offensive to the values of our constitution and abhorrent to the concept of justice expected by our constitution. They are one of many reasons to explain why our criminal justice system has disproportionally affected African-Americans in our state and across the nation. In turn, they have helped create disproportionate paths and outcomes in life and continue to prolong inequality within a system of governing built on achieving equality. None of this will change, however, until our law governing this issue changes. Law, in every instance, must first reflect our highest understanding and then pass that understanding onto those people it affects and those who implement it. While a legal requirement for officers to exclude race as a motivation for a stop may be difficult to enforce, this difficulty should itself not deny its force and effect. Law enforcement officers place their lives on the line every day to uphold the law under the most difficult circumstances. They serve to protect the people at all costs. They would strive to enforce this law too, driven by the understanding that identifying and removing race as a motivation for a stop will extend protections to people far beyond the moment. This change would work to eliminate the unconscious origin of a pervasive source of discrimination and allow us to better achieve the equality promised in life by our constitution. The law must always serve as the means to achieve this end.
*864 The majority suggests our previous interpretations of article I, section 8 of the Iowa Constitution to mirror the Fourth Amendment of the United States Constitution warrants a parallel analysis of pretextual stops. While I respect the wisdom and competency of the Supreme Court, we should not adopt its analysis of this issue at the expense of the rights of Iowa's citizens and, in particular, the rights of our citizens of color.[7] The Supreme Court's interpretation of constitutional rights under the Federal Constitution need not limit the rights provided to Iowans under the Iowa Constitution. State v. Baldon , 829 N.W.2d 785, 791 (Iowa 2013) ("[T]he Supreme Court's jurisprudence regarding the freedom from unreasonable searches and seizures under the Fourth Amendment-or any other fundamental, civil, or human right for that matter-makes for an admirable floor, but it is certainly not a ceiling."). We have routinely recognized our authority in "independently construing provisions of the Iowa Constitution that are nearly identical to the federal counterpart." State v. Pals , 805 N.W.2d 767, 771 (Iowa 2011) ("[W]e jealously protect this court's authority to follow an independent approach under our state constitution.").
Unfortunately, the majority has not utilized our independence in deciding the present case. Instead, it ultimately follows the reasoning of the United States Supreme Court's decision in Whren v. United States , 517 U.S. 806, 819, 116 S. Ct. 1769, 1777, 135 L.Ed.2d 89 (1996).
The Whren doctrine is wrong largely because it gives police officers too much authority, which has led to the misuse of that authority and has allowed police officers to engage in fishing expeditions based on offensive motivations. Whren recognized race-based law enforcement as unconstitutional but held "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Id. at 813, 116 S. Ct. at 1774. In effect, the decision masks an officer's improper racial motivations when making a traffic stop. Impure motivations are deemed justified by finding a traffic violation was committed, however minor that violation may be. For this reason, Whren has been widely criticized as legalizing racial profiling in the context of traffic stops. See Devon W. Carbado, From Stopping Black People to Killing Black People: The Fourth Amendment Pathways to Police Violence , 105 Calif. L. Rev. 125, 129 (2017) [hereinafter Carbado] ("[T]he Court's legalization of racial profiling exposes African Americans not only to the violence of ongoing police surveillance and contact but also to the violence of serious bodily injury and death."); Darrell D. Jackson, Profiling the Police: Flipping 20 Years of Whren on Its Head , 85 UMKC L. Rev. 671, 680 (2017) [hereinafter Jackson] (arguing the Court's discussion of racial profiling under the Fourth Amendment "authorized the use of racial profiling for all criminal investigations"); Kevin R. Johnson, *865 How Racial Profiling in America Became the Law of the Land: United States v. Brignoni-Ponce and Whren v. United States and the Need for Truly Rebellious Lawyering , 98 Geo. L.J. 1005, 1070 (2010) [hereinafter Johnson] ("The Court's refusal to consider the intent of police officers in its Fourth Amendment analysis created a safe haven for racial profiling by the police."). In effect, the Supreme Court "balanced the need of law enforcement officers to engage in [discriminatory traffic stops] to root out crime against the right of minority communities to be free from race-based practices." I. Bennett Capers, Crime, Legitimacy, and Testilying , 83 Ind. L.J. 835, 859 (2008) [hereinafter Capers] (discussing the consequences of the court's stop-and-frisk decision).
The majority's suggestion that the proper constitutional basis for a discrimination claim is the Equal Protection Clause neglects the significant difficulties in bringing a successful equal protection claim.[8] Furthermore, the Equal Protection Clause's civil remedy does not provide relief to defendants facing criminal penalties. United States v. Nichols , 512 F.3d 789, 795 (6th Cir. 2008) (barring the exclusionary rule as a remedy for an equal protection claim following an alleged racially motivated stop), overruled on other grounds as recognized in United States v. Buford , 632 F.3d 264, 269 (6th Cir. 2011). But see Terry v. Ohio , 392 U.S. 1, 12, 88 S. Ct. 1868, 1875, 20 L.Ed.2d 889 (1968) (stating that the exclusionary rule "is the only effective deterrent to police misconduct in the criminal context[ ] and that without it the constitutional guarantee against unreasonable searches and seizures would be a mere 'form of words' " (quoting Mapp v. Ohio , 367 U.S. 643, 648, 81 S. Ct. 1684, 1688, 6 L.Ed.2d 1081 (1961) )).
Even under an equal protection analysis, the ultimate issue is whether the disparate treatment is reasonable. Yet, it is article I, section 8 of the Iowa Constitution and the Fourth Amendment to the United States Constitution that specifically require all seizures by law enforcement to be "reasonable." Clearly, the text of the Search and Seizure Clauses support a reasonableness test, and it is not enough to brush the issue of racial profiling off as only an equal protection claim.[9]
The Whren decision "has greatly expanded the authority and power of law enforcement officers, and that discretion has exacerbated problems with racial profiling in law enforcement." Johnson, 98 Geo. L.J. at 1076. Many people of color feel racial profiling is endemic in current criminal enforcement. Id. Amici curiae, in support of Brown, state pretextual traffic stops
[a]ffect[ ] minorities disproportionately[;] they put People of Color in reasonable fear for the bodily safety and even the lives of themselves, their children, their loved ones and friends; and they exacerbate and perpetuate the profound problem *866 of racial disparities in the criminal justice system and society.
Brief of ACLU of Iowa et al. as Amici Curiae Supporting Appellant at 10, State v. Brown , 930 N.W.2d 840 (Iowa 2019). Amici also provide statistical data showing people of color, particularly African-Americans, are stopped, cited, and arrested at higher rates than Caucasian drivers throughout Iowa. Id. at 16-22 (finding nineteen percent of traffic stops in Iowa City involved minority drivers, although they made up only ten percent of the city's drivers, and black drivers in Scott County were stopped "nearly three times as often as white drivers") These disturbing trends are present nationwide.[10]
Even more alarming are instances when "an ordinary traffic stop [is] a gateway to extraordinary police violence." Carbado, 105 Calif. L. Rev. at 150, 163-64 (noting the police killings of Michael Brown, Walter Scott, Eric Garner, Alexia Christian, Sheneque Proctor, and Kendra James started as ordinary police interactions).
The majority contends that Brown has not provided any new arguments to justify departing from our holdings in State v. Griffin , 691 N.W.2d 734, 737 (Iowa 2005), and State v. Predka , 555 N.W.2d 202, 215-16 (Iowa 1996). It also suggests that racial profiling concerns should not inform our decision now because such concerns were present when we previously addressed the issue of pretext stops and did not influence our decisions. The very fact that racial profiling concerns persist should inform our decision today. Time has given us the opportunity to understand the importance of addressing these issues, not only for people of color who are negatively impacted, but also for all citizens.[11]
Since Griffin and Predka , our understanding of justice and the rights entailed in maintaining justice have evolved. Marginalized groups have continued to mobilize so that their voices can be heard and their struggles recognized. See, e.g. , Kimberlé Williams Crenshaw et al., African Am. Policy Forum, Say Her Name: Resisting Police Brutality Against Black Women 2 (2015) ("Say Her Name sheds light on Black women's experiences of police violence *867 in an effort to support a gender-inclusive approach to racial justice that centers all Black lives equally."). The efforts of marginalized groups have been impactful in raising awareness and altering society's collective understanding of the role race plays in policing. While it is unfortunate we did not recognize racial bias as a compelling consideration when deciding Griffin and Predka , it would be a deliberate oversight not to do so now. As a branch of government committed to justice and protection of the rights of all Iowans, we should not be so beholden to the past that we prevent ourselves from enacting justice in the present. In fact, Iowa's judiciary has consistently led the charge in recognizing civil liberties through thoughtful consideration of our constitution and application of the truth as derived by cultural understandings, societal changes, and research. See Varnum v. Brien , 763 N.W.2d 862, 906 (Iowa 2009) (holding a statute prohibiting same-sex couples from marriage unconstitutional six years before the United States Supreme Court followed suit); Coger v. Nw. Union Packet Co. , 37 Iowa 145, 159-60 (1873) (barring common carriers from discriminating on the basis of race); Clark v. Bd. of Dirs. , 24 Iowa 266, 277 (1868) (concluding the segregation of schools based on race was unconstitutional eighty-six years before the United States Supreme Court decided the same); In re Ralph , 1 Morris 1, 7 (1839) (recognizing the freedom of a former slave in the Iowa Supreme Court's premier case); Russell E. Lovell II, Shine on, You Bright Radical Star: Clark v. Board of School Directors (of Muscatine)-the Iowa Supreme Court's Civil Rights Exceptionalism , 67 Drake L. Rev. 175, 192 (2019) (discussing, among others, an 1869 Iowa court decision that allowed Arabella Mansfield to become the nation's first female attorney).
Additionally, the passage of time since Whren , Griffin , and Predka has not only given way to a greater understanding of implicit bias,[12] but also a greater understanding of the adverse role it can play in the vast discretionary decisions that occur throughout our criminal justice system. This new understanding supports a new approach to confronting implicit bias in all areas of our justice system, including racial profiling in traffic offenses. Moreover, the time and place for this new approach fits Iowa. The growing understanding of implicit bias within the last decade has supported a branchwide initiative to educate all Iowa judges and judicial branch employees on implicit bias. This initiative has provided training to all judges and continues today. Thus, our response in Iowa has not been to see the problem as too big or too hard to solve, but it has been to work to find a solution through greater understanding. We should follow this same approach today in response to the problem of racial profiling in traffic offenses.
Accordingly, the claim by the majority that a departure from Whren "would create instability in the law, hinder law enforcement efforts, weaken the strength of our adversarial system, and undermine public confidence in the legal system" is misplaced. In truth, the reasons expressed by the majority to follow Whren better describe the consequences of the failure to depart from it.
The majority suggests relying on a reasonableness standard would result in judicial overreach, unfairly focusing on an officer's *868 subjective state of mind. Yet, the suggestion that requiring officers to justify their objective reasoning would greatly hinder law enforcement is cause for concern, particularly because officers should only be utilizing objective reasoning when effectuating a traffic stop. It indicates there may be too heavy a reliance on pretextual stops. There is no element inherent in enforcing traffic laws that requires a police officer to engage in subjective reasoning before making a traffic stop. Adopting a reasonableness standard would not hinder law enforcement's ability to enforce traffic laws. Instead, it encourages equality in the enforcement of these laws.
The problem with pretextual stops does not stem from officers' enforcement of legitimate traffic laws; it comes from the disparate impact resulting from an officer's ability to make a stop motivated by subjective reasons, many times racial, and then only needing to justify the stop by citing a minor traffic violation. Or, as in the present case, it comes from an officer initially choosing not to enforce a traffic law, then deciding to make the stop based on subjective criteria, and then justifying the stop based on earlier objective reasons. For all that is known in this case, race could have been an unconscious motive operating in the mind of the officer from the beginning. Yet, our law does not make the officer accountable for the unconscious motive, but allows it to be left in the recesses of the mind and washed over with other motives such as gang affiliation in this case. But even this motive has its own implicit bias because there was no evidence of a criminal record or any particular background to show the affiliation was of a criminal nature. Gang affiliation can exist in neighborhoods for reasons independent of criminal activity and when broadly used as a motivation for a stop can have the same effects as using race.[13]
This permissible use of discretion contributes to inequality in the enforcement of traffic laws and subsequent prosecutions. In other cases, officers stop drivers not because of known gang affiliation but because of the color of their skin or their appearance, the neighborhood they are driving in, or any number of impermissible factors. These people are subjected to police stops, although others with different affiliations, skin color, or neighborhoods, committing similar minor traffic offenses are not. This type of policing results in a higher volume of violations found. In the many instances in which no wrongdoing is discovered, those subjected to the pretextual stops are left feeling targeted, unsettled, and apprehensive of law enforcement.[14] The "protections meant to curtail law enforcement's abuse of authority during traffic stops" cited by the majority do not address the disparity in making traffic stops and do nothing to address the problem of racial profiling.
*869 By placing a reasonableness component on the pretext, police will still be able to use minor traffic stops to investigate reasonable suspicion of other criminal activity, but the practice of pretextual stops unrelated to specific and articulable facts of criminal activity will be significantly reduced. This approach strikes the balance needed to advance the interests of all in our society.
The majority suggests that the reasonable-officer standard would place an undue burden on law enforcement. In criticizing the "mythical reasonable officer," the majority ignores the fact that a reasonable-person standard has been routinely applied within the field of search and seizure and has not crippled law enforcement's ability to do their jobs. See, e.g. , Terry , 392 U.S. at 30, 88 S. Ct. at 1884 (applying a reasonableness standard to analysis of stop-and-frisk situations).
Finally, unlike the majority, I do not believe that departing from Whren would weaken our adversarial system or undermine public confidence. Just the opposite is true. Applying a reasonableness standard would enhance the legitimacy of traffic stops and resulting prosecutions. Departing from Whren would demonstrate this court's refusal to provide a safe harbor for implicit biases to thrive. Employing a standard that demands fair and unbiased stops could also help to restore trust in law enforcement amongst disillusioned demographics.[15]
In effect, the majority concludes that our inability to control every variable leading to disparate enforcement means we should avoid addressing the issue of pretextual stops altogether. I disagree. The factors leading to disparate enforcement may be numerous, but the vastness of the problem emphasizes the necessity of our attention and in no way absolves us from evaluating the constitutional issue presented in this case. The difficulties in addressing this issue cannot excuse its continuation.
The majority remains hopeful that the employment of technology, such as police body cams and cell phone videos, will help monitor racial profiling. Furthermore, the majority quotes State v. Lopez for the proposition that "[t]he more evidence that a detention was motivated by police suspicions unrelated to the traffic offense, the less credible the officer's assertion that the traffic offense occurred." 873 P.2d 1127, 1138-39 (Utah 1994). Yet, under Whren , the consequences remain the same no matter whether the officer was racially motivated or whether video footage caught the encounter as long as a traffic offense occurred. Thus, people of color are still left with little protection against subjective enforcement of the law.
Current solutions to the problem of pretextual stops may not be perfect.[16] However, *870 they are a profound step in the right direction. There is value in providing a constitutionally sound standard for defendants to challenge police stops motivated by impermissible considerations. It reinforces and legitimizes the principle "that the Constitution prohibits selective enforcement of the law based on considerations such as race." Whren , 517 U.S. at 813, 116 S. Ct. at 1774. Moreover, it provides defendants with the opportunity to meaningfully appeal adverse decisions, an avenue effectively closed to them now. This is not only beneficial for defendants but to our court system and the development of our caselaw. It signals to law enforcement and courts that the use of implicit bias must be acknowledged and curtailed.
The majority's suggestion that the proposed solution will not achieve the desired result because an officer who engages in racial profiling is likely to be untruthful about it is off the mark. It neglects what might be the most important aspect of this case and this issue. Police officers, like the rest of us, have implicit biases they might not recognize. Simply acting on these biases does not indicate an officer's propensity to be untruthful. We should have more faith in our law enforcement and give them the opportunity to recognize their biases so that they can acknowledge and limit acting on them. For example, officers should take the opportunity to review the statistical data from their stops and analyze whether it reveals disproportionate enforcement. Furthermore, law enforcement agencies should invest in implicit-bias training so that all officers are aware of it. These types of changes can be enacted even in the absence of judicial action.[17] As it stands, the majority makes no move toward eliminating a practice that we recognize as unconstitutionally discriminatory. If our law projects that this practice is wrong, we can properly assume officers have enough respect for the law to comply with it. We would take a big step forward today if we were to use article I, section 8 of our constitution to at least say it is illegal for a police officer to use race or any other protected classification as the motivating factor to make a stop for a minor traffic violation, instead of following the Whren doctrine.
Judges have always been called upon to understand each issue that comes into the court from both perspectives and to then use this dual vision to build a model that solves the problem. The issues of racial profiling and implicit bias presented in this case are uniquely complex, but they can only be solved by understanding this complexity *871 and by building a standard that projects this understanding to all.

[T]he dual sovereignty found in our federal system provides state courts with freedom to formulate their own answers to issues such as what is an unreasonable search and seizure, what offends due process, and what violates equal protection. But with freedom comes responsibility. And responsibility can seem overwhelming. One way to deal with this is to refuse to make difficult choices and to rely on ready-made interpretations from the U.S. Supreme Court. But this is not the way the federal system was intended to work. State courts must resist the temptation to "escape from freedom." The ongoing American experiment in federalism deserves nothing less.
Timothy P. O'Neill, Escape from Freedom: Why "Limited Lockstep" Betrays Our System of Federalism , 48 J. Marshall L. Rev. 325, 333-34 (2014).

"On average, to take an equal protection claim to trial costs anywhere from $45,000 up to $125,000. Since the average defendant's income is approximately between $23,000 and $60,000," most avenues for such litigation are unavailable. Jackson, 85 UMKC L. Rev. at 680 (footnote omitted).

Moreover,
[t]he Fourth Amendment ... should be read as a protection of what it means to be "of the people," a limitation upon the ability of government to infringe upon the right to equal citizenship, equal worth, and equal autonomy in conducting searches and seizures. To be clear, I am not suggesting that the Fourth Amendment should be read as including causes of action based on the denial of equal protection, or as incorporating equal protection jurisprudence. What I am suggesting is that Fourth Amendment jurisprudence be guided by a commitment to equal citizenship.
I. Bennett Capers, Policing, Race, and Place , 44 Harv. C.R.-C.L. L. Rev. 43, 74 (2009).

The State of Missouri compiles an annual summary of traffic stop data. Att'y Gen. Josh Hawley, 2017 Vehicle Stops Executive Summary , Mo. Att'y Gen., https://www.ago.mo.gov/home/vehicle-stops-report/2017-executive-summary# (last visited May 17, 2019). The summary includes a disparity index calculated by dividing the percentage of traffic stops of a particular group by the percentage of the driving population constituted by the same group. Id. Data from 2017 revealed that "accounting for their respective proportions of Missouri's driving-age population, African-Americans were stopped at a rate 85% higher than Whites." Id.
Data from a similar 2017 Illinois report indicated nearly sixty percent of law enforcement agencies reported minority drivers were stopped at a higher rate than were Caucasian drivers. Alexander Weiss Consulting, LLC, Illinois Traffic and Pedestrian Stop Study: Traffic Stop Analysis 4-5 (Ill. Dep't of Transp. 2017).

Conceptual writings and empirical research have suggested that Whites experience both positive (i.e., privileges) and negative (i.e., costs) consequences as a result of racism.... The phrase costs of racism to Whites is defined as negative psychosocial consequences that Whites experience as a result of the existence of racism. Examples of these costs include guilt and shame, irrational fear of people of other races, distorted beliefs regarding race and racism, and limited exposure to people of different races and cultures.
Lisa B. Spanieman et al., Psychosocial Costs of Racism to Whites: Exploring Patterns Through Cluster Analysis , 53 J. of Counseling Psychol. 434, 434-35 (2006) (citations omitted) (analyzing the psychosocial costs of racism to Whites through a study of 230 White students, aged 18-44, attending a Midwestern university).

"Implicit biases are the plethora of fears, feelings, perceptions, and stereotypes that lie deep within our subconscious, without our conscious permission or acknowledgement." Mark W. Bennett, Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions, 4 Harv. L. & Pol'y Rev. 149, 149 (2010).

When applied to "gangs", risk analyses typically take the form of social profiling. This involves constructing a matrix of variables and matching individuals to the variables described in the gang matrix. Such processes tend to be descriptive and do little to provide a basis for understanding why and how specific groups of young people experience problems or find meaning in their lives.... [T]here is a strong correlation between poverty and crime, yet all poor people do not become engaged in criminal activity; nor do all 'criminals' originate from poor backgrounds. The same applies to gang membership and gang activities.
Rob White, Disputed Definitions and Fluid Identities: The Limitations of Social Profiling in Relation to Ethnic Youth Gangs , 8 Youth Justice 149, 157 (2008) (citation omitted).

"For these target groups, the perception is that being black or Hispanic alone carries a penalty: the taint of suspicion, the risk of a traffic stop, the risk of a canine sniff, the risk of a search." Capers, 83 Ind. L.J. at 849.

In 2017, a nationwide survey indicated confidence in police had risen to fifty-seven percent after a downward slope in 2014 and a record-tying low of fifty-two percent in 2015. Jim Norman, Confidence in Police Back at Historical Average , Gallup (July 10, 2017), https://news.gallup.com/poll/213869/confidence-police-back-historical-average.aspx [https://perma.cc/5BGE-JH34]. However, these overall trends disguise significant drops across several demographics. Id.
Though the overall numbers have rebounded, the years of national turmoil have only deepened the divide in the confidence that Americans of different ages, ethnicities and political beliefs say they have in the police. The loss of confidence is most apparent among Hispanics, liberals and those younger than age 35.
Id. Confidence rates also dropped among Black citizens, moderates, and Democrats. Id.

It has been suggested the value of the "would have" test is limited to situations when police officers admit to using subjective motivations. Margaret M. Lawton, The Road to Whren and Beyond: Does the "Would Have" Test Work? , 57 DePaul L. Rev. 917, 918-19 (2008). Additionally, despite adopting the test, Washington courts may be reluctant to find that a police officer is lying about their motivations or "have difficulty discerning pretextual behavior without an admission." Id. at 919.

It has been suggested that historically marginalized groups should utilize profiling as a tool themselves "to identify, surveil, and if necessary, instigate proceedings against problem police officers." Jackson, 85 UMKC L. Rev. at 688. "[D]eveloping an offender profile[ ] is to present information that describes the characteristics of a probable offender and aid[s] in the analysis of the data for predicting future offenses and/or victims." Id. at 685 ; see also Linh Ta, Des Moines Police Know They're Biased. Here's How They're Trying to Mitigate It , Des Moines Register (Aug. 13, 2017, 4:04 PM), https://www.desmoinesregister.com/story/news/crime-and-courts/2017/08/13/des-moines-police-know-theyre-biased-heres-how-theyre-trying-mitigate-it/311895001/.
Another proposal supports harsher penalties for officers who commit perjury when testifying about an incident. Capers, 83 Ind. L.J. at 873. Such officers "should be investigated and prosecuted to the same extent a civilian witness would be." Id.